Helen MASCUILLI, Administratrix of
The Estate of Albert Mascuilli,
Deceased,

v.

UNITED STATES of America,
Appellant.

No. 13745.

United States Court of Appeals
Third Circuit.

Argued Feb. 23, 1962.

Reargued Sept. 20, 1962.

Decided Feb. 15, 1963.

Rehearing Denied March 21, 1963.

Alan Raywid, Dept. of Justice, Admiralty & Shipping Section, Washington, D. C. (William H. Orrick, Jr., Asst. Atty. Gen., Drew J. T. O'Keefe, U. S. Atty., Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Abraham E. Freedman, Philadelphia, Pa. (Wilfred R. Lorry, Charles Sovel, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for appellee.

Argued before GOODRICH, KALODNER, and GANEY, Circuit Judges.

Reargued before McLAUGHLIN, KALODNER and GANEY, Circuit Judges.

KALODNER, Circuit Judge.

Did a district court judge err when, in a wrongful death action in admiralty which alleged unseaworthiness and negligence, he entered a Pre-Trial Order which resolved the issue of liability in favor of the libellant and directed that the trial of the cause be restricted exclusively to the issue of damages?

That question is presented on this appeal from a subsequent decree entering judgment in favor of the libellant and against the respondent in the amount of

$124,000 following trial on the issue of damages.[1]

The Government has premised its appeal on the grounds that the judge who entered the Pre-Trial Order erred· (1) "in summarily holding the United States liable notwithstanding the existence of genuine issues of material fact" and (2) in imposing liability without making specific findings of fact and stating conclusions of law "as required by Admiralty Rule 46½"; and on its contention that there can be no recovery for unseaworthiness under the Pennsylvania Wrongful Death Statute.

Albert Mascuilli, a longshoreman employed by Northern Metals Company, stevedoring firm, was fatally injured under circumstances later detailed while assisting in loading cargo aboard the US NS Marine Fiddler, a vessel owned and operated by the United States. The libellant, his widow and Administratrix of his estate, filed action in admiralty against the United States for wrongful death alleging unseaworthiness of the vessel and negligence of its employees.

The Government, in its Answer to the libel, denied generally the allegations of unseaworthiness and negligence and affirmatively alleged that Mascuilli's death was caused solely by the negligence of Northern which, it was averred, had exclusive custody, control and supervision over the entire cargo loading operation. It later filed its Answers to the Interrogatories which accompanied the libel. Thereafter, the libellant filed written Requests for Admissions of Facts, to which the Government made no reply.

There followed a pre-trial conference at which libellant moved for summary judgment on the grounds that the unanswered Requests for Admissions must be deemed admitted and that these Admissions were sufficient to support a finding

of liability against the Government. She then withdrew [2] the Motion for Summary Judgment and moved instead for a finding of liability under Rule 44½ of the Rules of Practice in Admiralty and Maritime Cases, "Pre-Trial Procedure; Formulating Issues". Following argument on this Motion the district court judge, on December 5, 1960, filed a "Memorandum", reported at 188 F.Supp. 754 (E.D.Pa.1960), in which he stated in part:

"We are convinced from an examination of the requests for admissions, which were not denied, that the liability of the respondent is established beyond question. * * * We conclude, therefore, that the Court has the authority in these particular circumstances, and in the light of Rule 44½ of the Admiralty Rules, 28 U.S.C.A. to limit the issues to be tried to the question of damages."

In the Pre-Trial Order it was said in part:

"The liability issue is resolved by reason of the admitted facts and there is no issue as to liability now existing between the parties to this action; the admitted facts clearly establish liability of the respondent for the death of Albert Mascuilli on May 1, 1959; it will be unnecessary to adduce any further proofs relating to liability at the trial of this cause; the evidence at the trial shall be restricted exclusively to proof of the quantum of damages."

As was earlier stated, at the trial on the issue of damages only, the trial judge issued a Decree awarding $124,000 to the libellant.

These facts are undisputed:

On May 1, 1959, the Marine Fiddler, a military transport, was being loaded in part with a cargo of 61¼-ton Army

---

1. The instant appeal is focused on the Pre-Trial Order.

2. The Government in opposition to the Motion for Summary Judgment, had pointed out that the Rules of Practice in Admiralty and Maritime Cases then pre-

vailing, did not authorize summary judgments. It may be noted, parenthetically, that the Admiralty Rules were amended the following year to provide for summary judgments, by adding Rule 58, the counterpart of Rule 56 of the Federal Rules of Civil Procedure.

tanks by the Northern Metals Company ("Northern") an independent stevedore, under a contract with the Government which gave Northern sole custody and control of the cargo areas of the vessel and its cargo handling gear. The initial rigging of the gear had been previously carried out by the ship's crew.

The vessel was equipped with a heavy lift swinging boom. This consisted of a large jumbo boom, capable of supporting weights up to 150 tons, which was located amidship at the after portion of the No. 3 hold, and three vang guys which were powered by winches and which swung the jumbo boom into the desired position. Two of the vang guys were on the starboard side of the vessel and one on the port side. The vang guys were electrically powered and each was equipped with a tripper (circuit breaker) in the electrical circuit designed to shut off the winch should the strain exceed the designated safe load to be carried. The vang guys were attached to the cargo hook by means of fish plates (triangular shaped pieces of metal) and shackles. The vang guy on the port side which figured in this accident was attached to a separate fish plate which, in turn, was shackled to the cargo hook. The shackle was 2½ inches in diameter and weighed approximately 90 pounds. It had a rated strength of 225 tons and a safety factor of four giving it a safe working load of 56 tons.

Just prior to the accident, one of the Army tanks had been lifted from the pier and was centered over the hatch opening of No. 3 hold preparatory to its being lowered into the hold. Mascuilli was assisting in guiding the tank through the hatch opening when the shackle connecting the port vang guy to the fish plate on the boom parted causing the vang guy and its appurtenances to lash back and strike Mascuilli. He died half an hour later.

That the vang guy shackle parted because of excessive strain was never disputed. The Government had so stated in its Answers to libellant's Interrogatories. Moreover, Requests for Admissions No. 18, admitted by reason of the Government's failure to reply, stated that "The shackle parted because of the excessive strain placed upon it in the loading operation."

In its Pre-Trial Memorandum below, the Government took the position that the accident was caused solely by the improper handling of the boom and winches by the stevedoring contractor and its employees and not by reason of fault or negligence on its part or by any defect in the shackle which parted.

The libellant in her Pre-Trial Memorandum did not make any claim that the shackle was defective. She, in sum, ascribed the parting of the shackle to the excessive strain placed upon it in the loading operation by reason of the asserted circumstances that the 61¼-ton weight of the Army tank being loaded at the time of the accident was "heavier than the safe working load of the shackle", viz. 56 tons. The Government, said the libellant, "knowing the nature of the cargo to be loaded aboard the vessel, and being aware of the working capacity of the gear, was negligent in not providing stronger shackles, and the use of a shackle whose safe working load was less than the weight of the draft made the deck of the vessel an unsafe place to work" and "these circumstances constitute an unseaworthy condition."

On this appeal the libellant urges that the admitted fact that the 56-ton *safe working load* of the shackle was exceeded by the weight of the cargo carried—61¼ tons—established beyond question the liability of the Government on both the issues of negligence and unseaworthiness of the vessel and that the entry of the Pre-Trial Order was therefore not erroneous. On this score it must immediately be noted that neither the Pre-Trial Order nor the Memorandum which accompanied it indicated the character of the liability resolved by the Court, viz. whether it was negligence or unseaworthiness or both.

The libellant here also contends that an added or alternative basis for the court's finding of liability was the *pos-

*sibility* that the vang guy winches could have contributed to the strain which caused the shackle to part, because of the improper setting of the "cut-off" devices or trippers, or their failure to function. Of this contention it need only be said that the court below stated both in its Pre-Trial Order and the accompanying Memorandum that the finding of liability which it made was based only on the admitted Requests for Admissions and an examination of the Requests for Admissions fails to disclose even a suggestion that the vang guy winches contributed to the strain which caused the shackle to part, and we are here concerned only with the issue as to whether the admitted Requests for Admissions justified the Pre-Trial Order.[3]

We come now to the critical issue as to whether there existed in this case a genuine issue as to a material fact which precluded the entry of the mooted Pre-Trial Order which was in effect a summary judgment on the issue of liability.

We have time and again held that summary judgments cannot be granted when there is a genuine issue as to a material fact presented by either of the parties to an action; that pre-trial procedures are not intended to serve as a substitute for the regular trial of cases, nor are they intended to transfer to the pre-trial conference judge the traditional jury function of resolving factual issues.[4]

It is true that in the instant case the Government admitted that the vang guy shackle "parted because of excessive strain placed upon it in the loading operation" and that this "parting" resulted in the fatal injuries to Mascuilli. But, as the Government points out, "the origin of the excessive strain and how it was generated, the extent of the excessive strain, the parties who caused the excessive strain, and who bore the responsibility for preventing an excessive strain are all plainly material questions" which

were not resolved by the *admitted facts* (facts admitted by reason of failure to answer the Requests for Admissions).

As earlier stated, the Government in its Answer to the libel denied unseaworthiness of the vessel and denied negligence on its part in the happening of the accident. Further, in its Answer, the Government presented an affirmative defense that the accident was caused solely by the negligence "of others" and on this score it averred that the stevedore Northern was in "sole custody and exclusive control of the cargo areas" of the vessel, "its gear and appurtenances" and had contracted to load the cargo. In its Answers to the libellant's Interrogatories the Government stated that "the actual loading operation was performed by the stevedores from Northern Metal Company", and paragraph 3 of the libellant's Requests for Admissions was to the same effect.

In its Answers to the Interrogatories the Government specifically stated that the shackle was not defective and that laboratory tests by a named metallurgist at the Philadelphia Naval Shipyard made after the accident showed the shackle to be "free from defects".

The Government indicates in its brief its theory that the excessive strain which caused the parting of the shackle was due to the fact that during the course of lowering the Army tank through the hatch opening the longshoremen improperly allowed the boom and vang guys to be placed at such an angle that the vang guys and their winches were pulling against one another in almost opposite directions.

The Government here also takes issue with the libellant's contention that the finding of liability below was justified on the admitted fact that the 56-ton *safe working load* of the parted shackle was exceeded by the weight of the 61¼-ton Army tank being loaded at the time of

---

3. The Government in its Answers to Interrogatories—Nos. 38 and 39, stated that the winches were equipped with "trippers" (shut-off devices), described their

setting and said all were "in working condition."

4. Lynn v. Smith, 281 F.2d 501, 506 (3 Cir. 1960) and the cases therein cited.

the accident. The port vang guy and its connecting shackle, says the Government, were used merely to steady and position the Army tank and not to support it and this is demonstrated by the fact that the tank did not fall when the shackle parted but remained suspended by the cargo hook and the boom. The shackle rigged to the vang guy was never at any time designed or intended to support the weight of the cargo, says the Government, and nowhere in the Admissions is there any statement that it did. Moreover, the Government urges, there is no finding that the 61¼-ton weight of the tank was "the excessive strain" which caused the parting of the shackle. On that score the Government points out that the actual strength of the shackle was 225 tons even though its *rated working strength* was 56 tons.

What has been said plainly discloses that there were genuine issues as to material facts presented and that accordingly the entry of the mooted Pre-Trial Order resolving the issue of liability in favor of the libellant was in error, and must be reversed.

It may well be that the trier of the facts when the case comes to trial on the issue of liability will credit the libellant's view as to the cause of the tragic accident here involved but the Government is clearly entitled to present its testimony in an effort to sustain its version of the occurrence.

Because of the view stated it is unnecessary to consider the other points presented.

For the reasons stated the Decree filed April 11, 1961 entering judgment in favor of the libellant in the amount of $124,000 against the United States will be vacated and the Pre-Trial Order filed December 5, 1960 will be reversed with directions to proceed in accordance with this Opinion.

GANEY, Circuit Judge (concurring).

I concur in the result reached by the majority, but not for all of the reasons upon which they predicate it.

The reason given by the majority for reversing the lower court and remanding the matter for trial is, quoting the Government's brief, "The origin of the excessive strain and how it was generated, the extent of the excessive strain, the parties who caused the excessive strain, and who bore the responsibility for preventing an excessive strain are all plainly material questions" and, accordingly, not being answered in the record, should be decided by a jury. However material these might be, they are all answered, in my judgment, with the exception of one which I shall advert to later, by the admission of the Government that the "vang guy shackle" parted because of "excessive strain placed upon it in the loading operation." This is so because of the admissions in the record that the loading was done by the stevedores of the Northern Metals Company, in attaching the tank to the cargo hook and the fall of the boom, as well as in operating the No. 3 winch which controlled the vang guy and shackle. Therefore, we know the "origin of the excessive strain", who generated it, as well as the parties causing it. Further, "the extent of the excessive strain" is shown by the further admission that the weight of the load on the cargo hook and the fall of the boom was a 61¼ ton tank and the safe working load to be carried by the vang guy shackle was 56¼ tons. Therefore, while the weight of lifting the tank was on the cargo hook and the fall of the boom, which did not break, the positioning of the tank, to put it in the square of the hatch, was done by means of the vang guy and shackle which was only rated for a working load of 56¼ tons. Accordingly, in the loading operation of the tank, there was too great a strain upon the vang guy and shackle in positioning it over the square of the hatch with the contending stresses and strains attendant to so doing and it broke and lashed back and killed the plaintiff's decedent. On the winch controlling the vang guy for the No. 3 hatch, there was a tripper which, when properly set, would shut off the current or give warning that an excessive strain was being placed on the

vang guy in the operation. There are no admissions here with respect to what working load the tripper was set for or who set it. If it was set for a load in excess of the safe working load of the vang guy, under the admiralty law, an unseaworthy condition obtained on the ship and the negligence of the stevedores in improperly positioning the load, or in placing too heavy a load on the cargo hook and fall, brought into play this unseaworthy condition. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 426, 79 S.Ct. 445, 3 L.Ed.2d 413. The only factual difference between this case and our own is that the tripper in that case (and as in our own, was found in good working order) regulated the fall on the boom or lifting operation, while in our case the tripper regulated the load on the vang guy. It may well be that the failure to set the tripper on the vang guy winch at its proper rating at hatch No. 3 was negligence, if not unseaworthiness, on the part of the owner of the vessel, since the members of the crew rigged the gear which the stevedoring company employees operated. However, as is indicated, there is nothing in the record to show what working load the tripper on the vang guy winch operating at No. 3 hatch was set for, as the answer to interrogatory No. 38, which posed the question, merely admitted that the winch was equipped with trippers and that the "Guy winches had trip setting of 550 amperes and branch circuit breaker of 275 amperes." Whether or not this answer, in terms of amperes, is a setting above the safe operating load of the vang guy winches is, at best, unclear, and since no positive findings with respect thereto can be gleaned from the answer, the matter should be remanded to the lower court in order to have full information to draw a proper conclusion.

Additionally, it should be determined upon remand, if liability is to be imposed, whether the death of the plaintiff's decedent was caused by negligence or unseaworthiness, or both, for an interesting problem is posed for the Court as to whether, under the Pennsylvania Wrongful Death Act [1] and the Survival Act,[2] the cause of action is compensatory, particularly if unseaworthiness without negligence be determined as the cause of death.

1. Act of April 15, 1851, P.L. 669, § 19, 12 P.S. § 1601.

2. Act of April 18, 1949, P.L. 512, art. VI, § 601, 20 P.S. § 320.601.