**Helen MASCUILLI, Administratrix of the Estate of Albert Mascuilli, Deceased**

v.

**UNITED STATES of America,**
**No. 203 of 1959.**

United States District Court
E. D. Pennsylvania. ·
May 4, 1965.

**356**

———◆———

Milton M. Borowsky and Freedman, Borowsky & Lorry, Philadelphia, Pa., for libellant.

Drew J. T. O'Keefe, U. S. Atty., and Sidney Salkin, Asst. U. S. Atty., Philadelphia, Pa., Alan Raywid and Daniel Leach, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for respondent.

BODY, District Judge.

This case is before the Court on a remand from the Third Circuit Court of Appeals where it was determined that a District Court judge erred, in a wrongful death action in Admiralty which alleged unseaworthiness and negligence, by entering a Pre-Trial Order, 188 F.Supp. 754, that resolved the issue of liability in favor of the libellant and directed that the trial of the cause be restricted exclusively to the issue of damages. Accordingly, the case was heard by another District Court judge who after trial entered a judgment in favor of the libellant and against the respondent in the amount of $124,000.00. However, on appeal the Appellate Court held (313 F.2d 764, 768 (1963)):

> "For the reasons stated the Decree filed April 11, 1961 entering judgment in favor of the libellant in the amount of $124,000 against the United States will be vacated and the Pre-Trial Order filed December 5, 1960 will be reversed with directions to proceed in accordance with this Opinion."

From the above directive this Court concluded that the cause should be tried as to the issue of liability and to the issue of damages since both the judgment was vacated and the Pre-Trial Order was reversed.

### FINDINGS OF FACT

1. The U.S.N.S. "Marine Fiddler" was a public vessel operated by the respondent, United States of America, through its agency, The Military Sea Transportation, United States Navy.

2. The said vessel had been built at Sun Shipyard in Chester, Pennsylvania, in August 1945 and was converted into a heavy lift cargo vessel in April 1954, with changes in her structure, mast, booms and other equipment at No. 3 and No. 4 hatches, in order to handle extremely heavy cargo weighing up to 150 tons. These changes rendered the U.S.N.S. "Marine Fiddler" one of a few vessels afloat with such heavy cargo handling capabilities that resulted in its entire loading system and equipment being unique and more complicated than the normal cargo vessel.

3. On May 1, 1959 the said vessel was moored port side to at one of the docks of the Northern Metals Company upon the navigable waters of the Delaware River in the Port of Philadelphia to take on a cargo of heavy army tanks, designated as M103A1 tanks, each weighing in excess of 61¼ tons.

4. The Northern Metals Company, an independent expert stevedore contractor, was engaged by the Government to handle government cargoes in the Port of Philadelphia. The contract contained the customary provision requiring the independent expert stevedore contractor, Northern Metals Company, to fully handle the loading and stowing of cargo aboard the said vessel.

5. All of the cargo handling gear and equipment at the No. 3 hatch was furnished by the respondent and had been rigged by members of the crew of the vessel prior to the commencement of cargo operations on May 1, 1959. The principal parts of this gear consisted of a 150-ton swinging jumbo boom, equipped with an 18-part topping lift purchase,

and hoisting gear with a 14-part purchase between the upper and lower block, the latter being affixed to a cargo pendant consisting of a swivel above and below a flounder, into which was shackled by means of a vang spreader, or a fish plate, a single guy or vang secured to a vang post at the after port corner of the hatch, and on the starboard side a vang spreader was shackled to the flounder to which two vangs were connected, one secured at the opposite end to a vang post at the forward starboard corner of the hatch, and the other to a vang post at the after starboard corner.

6. The jumbo boom was raised and lowered in a vertical plane by means of a topping lift and was swung inshore and offshore by the vanks attached to the flounder of the cargo pendant. Each of the vangs had a 10-part purchase and each set of lines and guys was operated by its own independent winch. The winches which activated the topping lift and hoisting gear were located on the deck. The controls for these winches were located upon the after starboard platform and were operated by a single winchman. However, the winches could not be operated simultaneously; that is, the boom could not be topped or lowered at the same time the hoisting gear was being raised or lowered, and vice versa. The winches for the vangs were located on deck. The controls for the port and starboard after vangs were upon an elevated platform on the after port end of the hatch and were regulated by a single operator; and the forward starboard vang control was on an elevated platform at the forward end of the hatch and was operated by another winchman.

7. The handling of the cargo and the operation and movement of the ship's heavy lift gear was performed entirely by Northern Metals employees and under the supervision of a Northern Metals foreman. The deck gang consisted of four winch operators, two tag line tenders, and the foreman who also acted as a signalman. Of the four winchmen, Charles Mascuilli operated the two after vang winches from a control position on a platform on the port side of the king post. A second winchman, Kranicki, operated the forward starboard vang winch from a control platform at the forward end of No. 3 hatch. A third winchman, Ringler, operated the hoisting and topping winches from a control platform on the starboard side of the king post. The fourth winchman, Maliszewski, operated a snaking winch at the after port corner of the hatch which was used to move or "snake" the cargo under the coaming in the hold. All of these men were experienced winch operators with years of winch operating and cargo handling experience.

8. When the longshoremen came aboard the vessel they were questioned as to their familiarity with the ship and its gear by the First Officer. The First Officer was informed by several of the longshoremen that they had operated this type of heavy lift gear, and the remaining longshoremen assured him that all of them were veteran longshoremen with many years of experience and quite able to handle these loading operations. However, several experienced crewmen instructed the longshoremen in the operation of the heavy lift gear and the individual duties of the different winchmen. All winch controls operated in the conventional manner, and instructions for operating the same were posted beside the winches.

9. The First Officer, Mr. Henry, stood by throughout the day's operation to insure proper handling of the gear and proper operation of the winches, and advised and cautioned the foreman-signalman Majdowski to be sure that the hoisting gear blocks were not pulled too close together, or the vang lines pulled too tight. After delivering these precautionary instructions, Mr. Henry testified that he was told on these occasions by Majdowski that his men were skilled and experienced longshoremen, and that the work would be done in the same manner. It must be noted that Majdowski was not called as a witness for the plaintiff to refute Mr. Henry's testimony.

10. To facilitate the loading of the M103A1 tanks, the 150-ton heavy lift boom at No. 3 hatch was rigged for port side loading; there were three vangs in use: two after vangs, port and starboard, located on each side of the boom and running to vang posts at the after end of the hatch, and an offshore vang at the forward starboard end of the hatch. These vangs are designed only to swing the boom and do not support the weight of the cargo. In swinging the boom outboard over the pier to pick up a tank, the after port vang is heaved in and the two offshore starboard vangs are slacked off. When the boom is at the desired horizontal angle over the pier, heaving is stopped on the port vang and the vang is slacked. The boom is then lowered by other winches, as stated before, that activate the topping lift and hoisting gear. While the tank is attached to the hook and raised, the forward starboard vang is used to check the swing of the boom as the vessel takes a slight port or inshore list as the 61¼ ton tank is raised on the hook. When the tank is raised clear of the side of the vessel by hoisting and topping the boom, the forward starboard vang then pulls the tank toward the hatch since it is in the best position to perform this job being at right angles to the load. The after starboard vang is of no use initially in pulling the boom since its angle to the heel of the boom is too acute and would exert an undue strain on the boom. The after port vang *must be kept slack constantly* by additional paying out of the winch while the boom and tank are swung over the hatch. Thereafter, the port vang will not be used again unless it is necessary to check the swing of the boom and tank as they are positioned over the hatch.

11. At approximately 5:00 P.M. Mr. Henry left the deck and was replaced by Third Officer Moore as deck officer to observe the loading operation. Until this time eight tanks were successfully loaded by the longshoremen, indicating that they were capable and competent to operate the gear in a proper manner. Six of the tanks were stowed in the lower hold and two in the 'tween-deck.

12. Five minutes after Mr. Moore was on deck, while Mr. Henry was eating supper, the accident occurred when *suddenly, without warning,* the port shackle holding the vang spreader to the flounder *suddenly parted* and the vang and connected parts recoiled and dropped to the after port deck, striking and inflicting fatal injuries upon the libellant's decedent, Albert Mascuilli. (See libellant's proposed findings of fact No. 10)

13. At no time during loading should the after port vang and the forward starboard vang become simultaneously taut and, since these vangs are positioned opposite one another, there is no practical reason for, or purpose served by causing both vangs to become simultaneously taut. The only feasible explanation for permitting these individual vangs to become simultaneously taut, also known as tightlining, would be inadvertence or inattention in the operation of the vang winches.

14. The principle of tightlining can best be illustrated by visualizing two lines supporting a weight where the angle between the lines is zero degrees and each line supports one-half of the weight in this position. As the angle between the two lines increases, the load that the weight exerts is increasingly multiplied, and when the lines are at a theoretical 180 degrees, or in a straight line, the multiplied load of the weight upon the two lines is infinite.

15. When the after port and forward starboard vangs are simultaneously tightlined, an additional force exerted at any point along the tightline is multiplied greatly. This external force may be caused by (1) topping or hoisting the boom, (2) lowering the load, or (3) pulling on the after starboard vang, or a combination of (1) and (3) or (2) and (3). Any one of these sources may create an improperly excessive force sufficient to part the after port vang or the forward starboard vang, or any one or more of their connecting parts in the rig.

16. Once a condition as described in paragraph #15 has been created, there are no known or designed safety precau-

tions in marine architecture and engineering which will prevent the parting of vangs or guys and their connecting parts. Consequently, only careful and attentive operation of the equipment by the winchmen could prevent such a situation from occurring.

17. The design, drawings and specifications of the 150-ton lift gear installed aboard the "Marine Fiddler" in 1954 were submitted to and approved by The American Bureau of Shipping, the Coast Guard, and the Military Sea Transportation. The above specification called for four 2½ inch anchor bolt shackles to be used to connect the vang spreaders to the swivel or flounder plates.

18. In November 1958 The American Bureau of Shipping witnessed and approved a quadrennial inspection of the "Marine Fiddler's" 150-ton lift gear. The test was conducted according to ABS specifications that require the gear be tested by lifting up to 110% of its capacity, which in the instant case would be 165 tons. Further tests consisted of swinging the gear from a maximum lateral boom range on each side of the vessel, and raising and lowering the boom through a range of 25 degrees to 60 degrees. Upon completion of the tests, the gear was certified as to all the specifications set forth by The American Bureau of Shipping.

19. In April 1959, less than one month prior to the accident, The American Bureau of Shipping witnessed and approved an annual inspection of the "Marine Fiddler's" 150-ton heavy lift gear. The annual inspection required an examination of all moveable gear, wire, blocks and shackles. At the conclusion of this inspection the gear was certified as having successfully completed the annual inspection.

20. On April 30, 1959, the day prior to the accident, the 150-ton heavy lift gear at the No. 3 hatch was rigged by the crew of the vessel for portside loading; all running wires, blocks, booms and swivels were carefully greased and inspected. The port and starboard shackles attaching the vang spreaders to the

flounder plate were also inspected by the First Officer and the Boatswain and were found to be in first class condition with no evidence of fatigue, no signs of wear, marks, notches, cracks or paint flakes on either shackle.

21. The port and starboard shackles connecting the vang spreaders to the flounder plate were 2¾ inches in diameter, Type IV, Class 6, anchor bolt safety shackles with pin diameters of 3 inches, and weighed approximately 115 pounds each. Each shackle had a maximum breaking strength of 405,000 pounds and a proof load test requirement of 133,000 pounds. The shackles were obtained by the ship through the Naval Supply System from the Naval Supply Depot at Bayonne, New Jersey, in 1956 and were produced under Government Specification RR-C-271a.

22. The port shackle which parted was shown by metallurgical tests after the accident to fully comply with Government Specification RR-C-271a. Examination of the parted port shackle revealed that at the point of the break there was no evidence of any notch, scars, scratches, defects, imperfections or wear. Furthermore, there was no evidence of any fatigue or abrupt change in the shackle body at the point of break.

23. There was no elongation or notching of the port shackle at the point of break, but the shackle fragment revealed that the shackle had undergone considerable plastic deformation prior to parting. The plastic deformation was evidenced by (a) measurement of the angle of the legs as shown by the photographs, (b) missing paint chips or flakes in area of the break, (c) the bent pin, (d) the differences in hardness values at areas closer to the surface, (e) and the difference in Charpy V Tests (a test to determine the notch resistance characteristics of metals).

24. The starboard shackle placed opposite the port shackle in the rig also showed signs of considerable plastic deformation before the parting of the port shackle. This was observable by inspecting the shackle, and was verified further

**360**

by documented drawings and photographs.

25. The plastic deformation indicates that the shackle metal was ductile and that the shackle behaved in accordance with its designed specification. The ductility indicates that the parting *was not due to a brittle fracture* under low loads, but was a cleavage fracture parting under a high load well above the proof load. Brittle failures under loads well below the ultimate breaking strength of the metal occur only in the presence of a well-defined notch, crack or imperfection in the metal. No such notch or imperfection was found to exist in this shackle, and accordingly, the brittle or notch resistance values of the shackle metal have no bearing or relevance to the type of parting.

26. The Bureau of Ships specification for deck plate steel more than an inch thick requires a maximum carbon content of .24 and a manganese ratio of 2.5 times the carbon content in order to produce a tougher and more notch resistant steel. The Government specifications for forgings and fittings, which apply to shackles, require a maximum carbon content of .35 and no stated manganese requirements. The shackle in question had a carbon content of .17 and a manganese content of .41 which placed it not only within its own specifications, but within the more stringent specifications for deck plate steel carbon content, and within .015 of the manganese requirement.

27. The vangs were powered by electrical winches located on the deck at the corners of the hatch. The winches are run by 50 h.p. motors with a rated pull of 180 amperes giving a line pull of 6,100 pounds. The Bureau of Ships, Department of the Navy, required that these winches be tested and operated at 125% of the rated capacity.

28. Each of the vang winches was equipped with electrical cut-offs with an instantaneous automatic trip at 550 amperes in the electric motor which was sealed by the manufacturer. The 550 ampere automatic cut-off setting results in an instantaneous trip and must be placed at that setting to allow initial surges of amperage to start the motor.

29. In addition, each of the vang winches is equipped with a branch circuit breaker with a 275 ampere cut-off. The 275 ampere setting will not trip instantaneously but will trip after overloading since its activation depends upon the amount of overloading and the extent of time of overloading.

30. The vangs were connected to a ten part purchase with a sheave efficiency of 81%. Under such an arrangement, the line pull at the vang would be approximately 30 tons, an adequate pull for the maximum designed vang pull of 27 tons, and well within the safe working load of the shackle rated at 50 tons.

31. The winches have eleven operating positions neutral, five forward or paying-out positions, and five after or heaving-in positions. When the winch is in neutral, the brake is automatically engaged and the winch will not slack off. When the winch cut-offs are tripped, the effect is to shut off the power immediately and to engage the automatic brake holding the line in its existing condition.

32. When the winches are paying-out, *the cut-off will not trip.* When in a paying-out position, an excessive force is applied, the motor becomes a generator and the excessive current is thrown into resistors, giving the winch a brake effect. In this situation the cut-offs in the winch motor and circuit breaker will not be affected by the amperage and thus the cut-off will not trip.

33. Whereas winch cut-offs can prevent an excessive straight line pull, they have no application in the instant case. First, the straight line pull of the winches at 30 tons is not sufficient to part the vangs or the vang shackles. Secondly, any winch cut-off only applies the winch brake; it does not slack off the vangs and hence, it would only preserve the tightline condition rather than relieve it. Thirdly, the winch cut-offs will not trip when the winch control is in neutral or when in a paying-out position. Since the testimony is that the after port winch

was being payed-out, the after port winch could never experience any cut-off action.

34. The Court has experienced much difficulty in determining with certainty how the accident occurred and the circumstances surrounding the same since the testimony of all the witnesses, including libellant's witnesses, is inconsistent as to each other in relation to the critical elements encompassing the accident precisely at the time of its occurrence. However, after an exhaustive review and deliberation of all the testimony and exhibits, notwithstanding the disputed and contradictory nature of the same, the Court has reconstructed the accident in the following manner:

A. Mr. Moore, the Third Officer, was stationed in a strategic position on the starboard side of the deck to observe and supervise the loading operations.

B. The entire deck gang, including the tag line tenders and winch operators, were under the supervision of Majdowski, the Northern Metals Company foreman, who also acted as a signalman during the loading of the tanks. Majdowski would station himself in such a position so that he could be visible to all members of the deck gang thereby enabling them to follow his signals throughout the entire loading operation. Without his instructions the loading could not proceed. *It is significant to note that this key and critical witness who could have explained his instructions as to the movement of the boom, and what orders had been given and executed at the time the accident occurred, was not summoned or called to testify, nor was his deposition taken although his name was listed in libellant's pre-trial memorandum.*

C. Eight 61¼ ton tanks had been lifted and stowed. Then the ninth 60¼ ton tank was lifted from the pier and swung over the deck on the port side of No. 3 hatch where it was rested momentarily while additional preparations were made in the hold by the carpenters; the tank was to be placed in the 'tween-deck level of the after port section of the hatch.

D. The tank was moved then to a position somewhere in the after port quadrant of the hatch. As the tank was being lowered a foot or a foot and a half by the jumbo boom which was at a vertical position of approximately 50 degrees to 55 degrees, without any warning or indication thereof, the port shackle parted. The parting was accompanied with such force and a tremendous release of energy that it was described as "thunder" or as an "explosion."

E. After the shackle parted, Ringler, the boom operator, put the winch in its maximum paying-out position "5" until the tank was from two to three feet below the coaming and rested on the starboard side of the hatch. This procedure was initiated by the boom operator so that the tank would not swing across the deck of the ship but would come to rest on the coaming or the hatch.

F. Charles Mascuilli, brother of the decedent, was in control of the two after winches at the time of the parting of the shackle. The after port vang winch was set at a paying-out position "1" and the after starboard winch was set on the heaving-in position "2".

G. The forward starboard winch operator, Kranicki, had not slackened off on his winch and his forward starboard vang was still taut at the time of the break. This was further indicated by the tank swinging to the starboard side of the hatch after the parting of the shackle. The forward starboard vang should have been kept completely slack throughout the entire part of this operation since the vang had no function to perform at this time.

H. Immediately after the parting of the shackle, parts of the vang and pendant, weighing approximately 800 pounds, recoiled and struck into the heavy metal housing of the winch. Part of the lines even lashed back to

the mast and the winch operators on the elevated platform had to duck for safety. Both the port and starboard shackles' bodies and pins were severely distorted in the process. During this moment or moments fatal injuries were inflicted upon the libellant's decedent, Albert Mascuilli, who was working on the deck as a tag line tender.

I. The vangs were leading upward at the time of the parting of the shackle. With the vangs leading upward, lowering of the tank would tend to slack off all the vangs. However, the after starboard vang was being heaved in at a greater rate of speed than the other vangs were being payed-out. The tension on the vangs created by this unsafe and unorthodox procedure could not have prevented a tightline effect. The tightline effect that existed between the after port vang and the starboard vang, and the heaving-in of the after starboard vang, could have been increased greatly by a momentary stopping of the lowering of the tank and a raising of the boom itself to a more advantageous position in the after quadrant of the hatch.

J. The directions of the signalman were not followed or were improper. It is obvious that no winch operator can predict the intentions or movements of the other two winch operators, and the coordination of all three winchmen is absolutely necessary for a proper and prudent movement of the boom in order to prevent tightlining or allowing the winches to oppose one another and to become tightlined. It is absolutely essential that all longshoremen act as a sole entity to insure the success of these operations. In this case, there was a failure by the longshoremen to cooperate and comply with the proper procedures.

K. Mr. Moore, the Third Officer, was attentive throughout the entire loading procedure and was unable to prevent the tightline condition since it occurred *suddenly and without warning*. There was no time to issue any warnings or instructions to any of the winch operators or the signalman.

35. In summary, the Court finds that the vessel and all of its equipment was in a seaworthy condition at all times, and remained so throughout the entire loading operations. The accident was caused solely by the negligent operation of the stevedoring crew using seaworthy equipment in such a manner as to cause the accident to occur so instantaneously that the Third Officer was unable to warn anyone or prevent its happening.

36. In the event that this Court would have found for the libellant, it would have assessed the damages in libellant's favor as follows:

A. All counsel stipulated that no testimony as to damages would be offered; in lieu thereof, a transcript of all the testimony and exhibits presented at the trial conducted in March of 1961 as to the issue of damages was made a part of the record in this trial.

B. The Court has studied diligently these 187 pages of testimony, and has considered carefully the arguments of counsel and the amounts of damages contended for by them.

C. At the time of his death on May 1, 1959, libellant's decedent was approximately forty-four years and nine months old. From the testimony of the actuary, the decedent had an overall life expectancy of twenty-nine years, and a worklife expectancy of twenty years.

D. The Pennsylvania Wrongful Death Act is controlling as to the calculation of damages, and all monetary losses must be certain and ascertainable.

E. It has been stipulated by counsel that there was no pain or suffering since the death was described by the attending physician as being instantaneous.

F. The damages must be computed according to law, and the interest in reference to present worth must be computed at the lawful rate of six percent. The present worth value of $1.00

per year payable at the end of 20 years at 6% is equivalent to 11.470.

G. The libel, as filed by decedent's libellant, makes no claim as to a monetary loss of inheritance for each surviving child.

H. Libellant has not sustained any monetary loss from the property investments which were owned by the estate of the deceased.

I. The pecuniary loss of income to decedent's estate is estimated at $60,-438.30, and is calculated as follows:

| | |
|---|---|
| 1956 Tax Return | $ 6,217.00 |
| 1957 Tax Return | 6,227.15 |
| 1958 Tax Return | 5,035.05 |
| 1959 Projected Earnings (Tax return to May 1, 1959 shows $3,091.00 earned) | 6,227.15 |
| Total Income 1956–1959 | $23,706.35 |
| Average Income 1956–1959 | $ 5,926.59 |
| 10% Permitted for Future Increases | $ 592.66 |
| Average Future Income | $ 6,519.25 |
| Less Living Expenses | $ 1,250.00 |
| | $ 5,269.25 |

(Present worth value of $1.00 per year payable at end of 30 years at 6% = 11.470.)

11.47 X $5,269.25 equals ..............$60,438.30

## CONCLUSIONS OF LAW

1. The libellant's decedent was killed as the result of the parting of a shackle which was one of the component parts of the gear at No. 3 hatch, which had been furnished by the respondent and rigged by members of the crew of the U.S.N.S. "Marine Fiddler" for use of the longshoremen.

2. A longshoreman injured while engaged in loading a vessel, the work traditionally performed by the crew, is entitled to recover for either negligence or unseaworthiness.

3. Since negligence and unseaworthiness are distinct and independent grounds for recovery premised on entirely different legal theories, even though they may on occasion overlap, the Court will consider them independently in the context in the present case.

4. Seaworthiness, a species of liability without fault, imposes a duty upon the shipowner to furnish a vessel and appurtenances reasonably fit for their intended use. This does not mean that a shipowner is an insurer or that he must furnish an accident-free ship. The ship need not be able to weather every storm, only that she be reasonably fit for her intended use.

5. The doctrine of unseaworthiness is not dependent upon actual or constructive knowledge of the shipowner nor of the merely temporary nature of the unseaworthy condition. An unseaworthy condition may arise from defective gear, appurtenance in disrepair, unfit crew, method of loading her cargo, or the method of storage.

6. This Court finds that the shackle that parted was well within its designed specifications, and in fact, superior to the specifications as set forth by The American Bureau of Shipping, and that it was free of any fatigue, wear, notches or imperfections. The high manganese-carbon ratio, which produces a tougher and more notch resistant steel, definitely shows that the shackle was not defective as to its method of manufacture. Throughout the entire loading procedure, the shackle remained in a seaworthy condition and reasonably fit for its intended use. It is to be noted that libellant did not claim that the parted shackle was defective in her pre-trial memorandum. Libellant failed to prove at the time of trial that the shackle specifications were inadequate or unfit for their intended use.

7. In addition, this Court finds, without any reservation, that all of the gear and appurtenances of the vessel were in a seaworthy condition and remained so throughout the entire loading procedure.

8. The winch cut-offs have no application or bearing on the instant case since the cut-offs will not trip while the winch is in a paying-out position. This testimony by respondent's expert witnesses was not contradicted by any testimony offered by the libellant. At the time of the accident the afterport vang winch, which was attached to the parted

shackle in question, was set at paying-out position "1". Consequently, the winch cut-off could not be tripped under these circumstances.

9. The cause of the injury in the present case was not the ship or its appurtenances since the U.S.N.S. "Marine Fiddler" was not in any manner unseaworthy or unfit for the services which she was to render.

10. The standard of reasonable care under the existing circumstances was met by the respondent by instructing the longshoremen how to operate the gear, by having the officers and crewmen stand by during the initial period of operation of the gear to insure understanding, and by warning the longshoremen against tightlining the vangs.

11. After adequate warnings and explanations, and after the longshoremen had successfully loaded eight tanks, there was no reason to believe that the longshoremen would not proceed carefully and properly.

12. Mr. Moore, the Third Officer, was stationed in a strategic position on the starboard side of the deck observing and supervising the loading operations when the accident occurred. He was attentive throughout the entire loading procedure, and was unable to prevent the tightline condition since it occurred suddenly and without warning. Libellant's proposed findings of fact (No. 10) concedes the accident occurred instantaneously and thus there was no time to issue any warnings or instructions to any of the winch operators or the signalman.

13. The lack of negligence by the respondent is strengthened by the fact that the libellant failed to call a key witness, Majdowski, to rebut the testimony of the officers of the ship.

14. Majdowski was the foreman for the Northern Metals Company; and the entire deck gang including the tagline tenders and winch operators were under his supervision. Majdowski also acted as the signalman during the loading of the tanks and without his instructions the entire loading procedure could not commence. It is significant to note that this critical witness who could have explained his instructions as to the movement of the boom, and what orders had been given and executed at the time the accident occurred, was not summoned or called to testify, nor was his deposition taken although his name was listed in libellant's pre-trial memorandum.

15. The accident was caused by a failure of the longshoremen to co-operate and comply with the proper loading procedure. The directions of the signalman were not followed or were improper. In the instant case, it was absolutely essential that all longshoremen act as a unit to insure the success of these operations.

16. As was stated by Judge Learned Hand in Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515, 518 (1952):

"* * * The warranty of seaworthiness as to hull and gear has never meant that the ship shall withstand every violence of wind and weather; all it means is that she shall be reasonably fit for the voyage in question. Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling. * * *"

See also Boudoin v. Lykes Brothers Steamship Co., Inc., 348 U.S. 336, 75 S. Ct. 382, 99 L.Ed. 354.

17. The longshoremen crew was not "equal in disposition and seamanship to the ordinary men in the calling" at the time the ninth tank was being loaded.

18. This Court now finds in favor of the respondent, and it does not believe that its decision is contrary to those principles enunciated by the United States Court of Appeals for the Third Circuit or the Supreme Court of the United States. The present case, in this Court's opinion, is a specie that belongs in that infinitesimal area that has been described *consistently* by all the Appellate Courts and the Supreme Court of the United

365

States as one in which an owner is not obligated to furnish an accident-free ship.

19. The instant case is one that stands on its own facts, merits, and unusual underlying circumstances, and consequently, has been analyzed thoroughly with a high degree of assiduity.

ORDER

And now, this fourth day of May, 1965, in accordance with the foregoing Findings of Fact and Conclusions of Law, it is ordered that judgment be and the same is entered in favor of the respondent, United States of America, and against the libellant, Helen Mascuilli, Administratrix of the Estate of Albert Mascuilli, Deceased, with costs to be assessed accordingly.