Hugh A. **ROBICHAUX**
v.
**KERR McGEE OIL INDUSTRIES, INC.**
**Civ. A. No. 10187.**

United States District Court,
W. D. Louisiana,
Lafayette Division.
Oct. 2, 1970.

Chester A. Eggleston, New Orleans, La., for plaintiff.

Hammett, Leake & Hammett, Robert E. Leake, Jr., New Orleans, La., for defendant.

## MEMORANDUM OPINION

PUTNAM, District Judge.

This case was remanded to us for additional findings on the issue of seaworthiness of the submersible drilling barge upon which plaintiff, a member of a casing crew employed by Sladco, Inc., was working at the time he was injured. See: Robichaux v. Kerr McGee Oil Industries, Inc., 5 Cir. 1967, 376 F.2d 447. The action, brought against Kerr McGee Oil Industries, Inc., owner of the barge, is grounded in maritime law under general principles of tort and for breach of the warranty of seaworthiness by defendant.

Submersible drilling barges are vessels, and those employed aboard them are classed as seamen if they are more or less permanently attached to the ship and their work contributes to the maintenance and safety of the vessel or its welfare while in navigable waters, or to the accomplishment of its mission. Offshore Co. v. Robison, 5 Cir. 1959, 266 F.2d 769; Producer's Drilling Co. v. Gray, 5 Cir. 1966, 361 F.2d 432; Marine Drilling Co. v. Autin, 5 Cir. 1966, 363 F.2d 579. The shipowner owes the duty of furnishing a seaworthy vessel to crew

members, which extends to those who are not members of the ship's company but who perform duties aboard the vessel such as are traditionally performed by seamen, under the doctrine of Seas Shipping Company v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) reh. den. 328 U.S. 878, 66 S.Ct. 1116, 90 L.Ed. 1646; as extended by Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

Following the trial, this court rendered judgment against plaintiff on the issue of negligence. Since there did not seem to us to be any serious question of fact on the issue of seaworthiness, we made no specific reference thereto when giving oral reasons for judgment from the bench at the conclusion of the evidence. However, in formal findings thereafter submitted by counsel for defendant, this issue was, we thought, adequately covered. In view of the speculation existing as to the effect of the decision of the Supreme Court in Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967), on the "operational negligence" v. "instantaneous unseaworthiness" debate reflected in Antoine v. Lake Charles Stevedores, Inc., 5 Cir. 1967, 376 F.2d 443, cert. den. 389 U.S. 869, 88 S.Ct. 145, 19 L.Ed.2d 146, the court felt that this issue was not sufficiently resolved by our remarks from the bench and formal findings which followed.

*Antoine* and *Robichaux,* supra, seemed to settle the question in this circuit. But in Satchell v. Svenska Ostasiatiska Kompaniet, 4 Cir. 1967, 385 F.2d 76, and Venable v. A/S Det Forenede Dampskibsselskab, 4 Cir. 1968, 399 F.2d 347, the court declined to follow the Fifth Circuit's course and held that *Mascuilli* had rejected the "operational negligence" defense of the shipowner in such cases.

▉ Although our own views were expressed in Hebert v. California Co., W. D.La.1967, 280 F.Supp. 754, and Hanks v. The California Company, W.D.La. 1967, 280 F.Supp. 730, at 738, 739, because the post *Mascuilli* question had

not yet been decided by this circuit and was then pending before the Court, we withheld action on the remand. Since then, in Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir. 1969, 412 F.2d 1011, the court has held that where injury results from "operational negligence" on the part of the longshoreman or other *Sieracki* type intermediary employee, and/or his fellow workmen, and is simultaneous therewith, the shipowner cannot be said to have breached his duty to furnish a seaworthy vessel. The exhaustive discussion of the problem by Chief Judge Brown in *Grigsby* and the conclusion therein expressed was followed without further comment in the *Usner* case. Although writs have been granted in *Usner,* 397 U.S. 933, 90 S.Ct. 940, 25 L.Ed.2d 114, the law that controls us here is now well established in this circuit. Duncan v. Transeastern Shipping Corp., 5 Cir. 1969, 413 F.2d 1023; Reed v. M/V Foylebank, et al., 5 Cir. 1969, 415 F.2d 838. In accord: Tim v. American President Lines, Ltd., 9 Cir. 1969, 409 F.2d 385.

The "instant unseaworthiness" question is squarely presented in Usner v. Luckenback Overseas Corporation, 397 U.S. 933, 90 S.Ct. 940, 25 L.Ed.2d 114 and should be laid to rest when that case is decided. However, after carefully reviewing the evidence in the case at bar and our notes taken during the trial, we have concluded that further delay of this decision is unwarranted. Further, there does not seem to be any necessity for the taking of additional evidence. All witnesses available were called at the trial and were fully examined by counsel on all aspects of the case. Only McFarland, the "pusher", or foreman of the casing crew, plaintiff himself, and a fellow employee of Sladco, Inc., James Allen, had any positive recollection of the occurrence.

Pulling casing in an oil well drilling operation is a specialized service not ordinarily performed by the regular drilling crew who drill the well. Joints of casing vary in length, and in diameter. On this particular job, 7⅝" casing in

forty-five foot lengths was employed. All of the equipment in use by the casing crew on this occasion constituted equipment, gear and appurtenances of the submersible barge in question, the KERR–MAC 46, owned by defendant, including the draw works, elevators, block, rotary table and spider. The draw works was operated by defendant's driller, Mr. Barbay. The rotary table is activated by the draw works, and bushings are installed in it to accommodate drill pipe of varying diameters used during the drilling operation. These bushings were removed and a "spider", described as "a big iron object with a hole in the middle of it", similar to a clutch, to accommodate the 7⅝" casing was installed to hold the casing pipe suspended in the hole below in place while the top joint was removed after being raised above the rotary table by the drilling rig. (Tr. 19)

Plaintiff's theory of the case was that there was too much slack in the snub line on the breakout tongs when the driller activated the draw works and applied power to the tongs, so that the bottom of the pipe was jerked forcefully, causing it to whip at the top and strike him on the head. He testified that from his position on the stabbing board forty-five feet above the derrick floor at the top of the joint of casing being removed, he observed the slack in the line and the next thing he knew he was struck and knocked backward, injuring his knee in the fall. He remained on the stabbing board for the remainder of the operation.

When a joint of pipe is removed, the entire string of casing in the well is lifted in the hold by the rig's travelling block with the use of elevators, which clamp around the casing just below the collar of the joint then being removed. The elevators are attached to the casing by members of the casing crew. The casing is then raised until the next joint is above the rotary table, the spider is set to hold the string in place and prevent it from falling back into the hole, and the man on the stabbing board signals the driller to slack off on the elevators. He unlatches the elevators, throws a rope around the casing while the man on the floor below uses the breakout tongs to apply such torque as is necessary to unscrew the top joint from the remainder of the string, in order for it to be stacked in the derrick out of the way, in preparation for the removal of the next joint.

McFarland, plaintiff's immediate superior and fellow Sladco employee, was handling the backup tongs. He remembered the accident, but contradicted plaintiff's testimony relative to the slack in the tong line. He stated that the tongs bit when he applied them to the casing, and when force was applied by the driller at the draw works, the spider slipped in the rotary and this caused the casing to whip at the top. He further testified that there was nothing wrong with the spider itself, and that it was properly installed. (Tr. 88.) Both McFarland and the driller testified that it is not an unusual thing for the spider to slip or jerk when the casing below the rotary table, remaining in the hold, is short and there is not enough weight to hold the spider in place. An event that is not unusual is, we take it, one that is to be expected.

All of the witnesses testified that in handling 7⅝" casing in 45-foot joints, because of the flexibility of the pipe, some whipping effect at the top is likely when power is applied to the tongs. The difference in their testimony is only as to the extent of the "whip", which necessarily must vary depending upon the amount of breakout torque applied.

Robichaux was an experienced casing hand. He had done this type of work for some 12 years preceding the accident, which occurred on January 18, 1964. It was his practice to unlatch the elevators *before* the joint was broken loose. He knew that the job in question called for removal of approximately 2500 feet of casing from this hole. He knew that as part of the operation as the string became lighter there was a likelihood of the spider slipping, and also

that casing would, and very often did, whip from side to side at the top when unscrewed or "broken out". He also knew that about forty joints had already been removed from this well, and the string in the hole was considerably lighter. On cross-examination he stated that it did not take much to cause that pipe to "whip" and, indeed, said that it was possible to shove it with his thumb and cause this effect. (Tr. 58).

McFarland also testified that the casing crew directs the manner in which the casing operation is conducted. Of course, in event of a disagreement with the driller or tool-pusher on the well, the latter would prevail. In this case, after the accident, the operation proceeded but Robichaux did not unlatch the elevators until the joint was broken out. Whether or not the elevators are unlatched before or after this is accomplished was a matter that McFarland left to Robichaux, the stabber, who usually works with the driller on this phase of the job. (Tr. 73, 74.) By leaving the elevators on, the top of the joint is prevented from whipping around in the derrick and the danger of accidents is minimized. With approximately forty joints of casing removed, the job was almost completed. Notwithstanding this, plaintiff continued unlatching the elevators prior to breakout, and at the time of the accident he was leaning over with his head approximately one inch from the top of the joint, looking down at the lead tongs on the breakout cathead side of the draw works. (Tr. 48.)

We take note of the fact that the witness James Allen attempted to corroborate Robichaux's testimony that there was slack in the tong line. On cross-examination, however, he stated that he did not see any slack, and did not know how the accident happened, except that he heard a noise and looked up into the derrick to see plaintiff fall.

■ The test of whether or not a vessel or its equipment is seaworthy lies in the answer to the question of whether or not the ship or its appurtenances are reasonably fit for her intended service. As was stated in Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L. Ed.2d 412, reh. den. 371 U.S. 853, 83 S. Ct. 16, 9 L.Ed.2d 93 (1962):

"A vessel's unseaworthiness might arise from any number of individualized circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The method of loading her cargo, or the manner of its stowage, might be improper. (Citing authorities.) For any or all of these reasons, or others, a vessel might not be reasonably fit for her intended service * * *"

In Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), it was held that any condition rendering the vessel unfit for her intended service, even though transitory in character, makes the vessel unseaworthy, since the shipowner's duty to furnish a seaworthy ship is absolute and is not satisfied by due diligence on the owner's part. In Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967), the Court included in the ever widening scope of the seaman's protection against unseaworthiness the assignment of insufficient manpower to the performance of a single manual task on an otherwise well-manned ship.

Throughout all these decisions and the cases cited therein the distinction between injury as the result of negligence and injury as the result of an unseaworthy condition of the vessel has been made and heavily emphasized. The end result of a failure to draw this distinction was the "* * * cryptic deliverance of Mascuilli * * *" (Grigsby, supra, 412 F.2d 1011, at 1033) after this case had twice been tried on its merits. See: Mascuilli v. United States, E.D.Pa. 1960, 188 F.Supp. 754; 3 Cir. 1963, 313 F.2d 764, on remand 241 F.Supp. 354, second appeal 3 Cir. 1966, 358 F.2d 133, cert. granted, rev'd and remanded 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967).

■■ It is not an easy task to draw this distinction in such cases. Here we have found that defendant shipowner was free of negligence. If the vessel

was unseaworthy, the rotary table, spider and elevators must be found not reasonably fit for their intended service. The evidence in this case belies such a conclusion. On the contrary, the vessel was one built and equipped to perform a special and very hazardous function or purpose, the drilling of oil wells on the outer continental shelf of the Gulf of Mexico. The cases cited by the Court in Morales v. City of Galveston, supra, and in a host of decisions by our own Court of Appeals for the Fifth Circuit, are equally positive that while the warranty of seaworthiness running from shipowner to seaman is one of the most pervasive rules of admiralty law, it *does not* require the owner to furnish an accident-free ship. It stops when the vessel furnished is reasonably fit for its intended service. Here the intended use of KERR–MAC 46 and its specialized equipment was in an area of the oil industry that has exacted a heavy toll in men and equipment over the years. The hazards are great and the dynamic forces brought into play are in some instances incapable of determination. Our conclusion was, and is, that this industrial accident did not result from an unseaworthy condition of the KERR–MAC 46, and this suit should be dismissed.

■ However, assuming the position most favorable to plaintiff, if we are wrong in the conclusion drawn above and the vessel was, in fact, unseaworthy, Robichaux is grounded on the reef of probable cause and his own contributory negligence. Casing whips as a result of principles of natural physics, spiders slip, even under the best of conditions, when the weight of the string below the spider reaches a point where it is insufficient to hold the gear in place on the rotary table when the torque required to breakout a joint is applied to the stand being removed. Bearing in mind that this force will vary from 4000 pounds per square inch to 8000 p. s. i., depending upon how tightly the joint is made up, the exact point when the elevators should be left closed during the breaking out process as a safety measure is one of those imponderables that was, in this case, left to Mr. Robichaux by his foreman, McFarland. He knew that casing was prone to whip, due to its flexibility, when the tongs were applied, and he also knew or should have known how many joints had been removed from the hole and approximately how many remained below the rotary. He was not required to place himself in a position of close proximity to the top of the joint being loosened, nor was he required to unlatch the elevators. Having unlatched the elevators and secured his line to this joint, reason would seem to dictate to a man of his experience and knowledge that he stand back as far as possible from the casing to avoid being struck if it did whip, a probability that was entirely foreseeable.

■ One engaged in a hazardous occupation owes a duty to maintain a proper lookout for his own safety, a proper lookout being such as a reasonably prudent person would exercise under the same or similar circumstances. A failure to do so is negligence on the part of the injured workman. Here plaintiff failed in this respect. What caused this accident was not the unseaworthy condition we now assume to have existed, but the fact that Robichaux assumed the position he did when ordinary care and prudence required him to stand away from the top of the joint, or to leave the elevators latched until the operation was completed.

We hold, accordingly, that plaintiff was negligent and this negligence was the sole proximate cause of the accident and his resulting injury. See: Timpson v. M/S Ecuador Maru, 5 Cir. 1970, 425 F.2d 1209, for a parallel situation.

The attorneys for defendant will prepare and present a decree in keeping with rule 9(e) of this court. Judgment will not be entered until such formal decree is signed and filed with the Clerk.

The foregoing memorandum opinion is intended to serve as and is our findings and conclusions in this case.