Roy Inman SMITH, Plaintiff,

v.

BROWN & ROOT MARINE OPERA-TORS, INC., Defendant-Third-Party Plaintiff,

v.

UNDERWATER SERVICES, INC., Third-Party Defendant.

Civ. A. No. 8891.

United States District Court W. D. Louisiana, Lake Charles Division.

June 30, 1965.

---

---

Bernard, Micholet & Cassisa, New Orleans, La., for plaintiff.

Eikel, Feltner & Goller, Houston, Tex., Hall, Raggio, Farrar & Barnett, Lake Charles, La., for defendant-third-party plaintiff.

Cavanaugh, Hickman, Brame & Holt, Lake Charles, La., Edward J. Villere, New Orleans, La., Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for third-party defendant.

HUNTER, District Judge:

This litigation began when Roy Inman Smith sued Brown & Root Marine Operators, Inc., for injuries sustained while engaged in marine diving from the Brown & Root Barge H. S. LINDSAY. Brown & Root impleaded Underwater Services, Inc., Smith's employer, whom it had engaged as an independent contractor to perform marine diving services in connection with the erection and repair of an offshore oil well drilling platform.

Smith sustained extremely serious and permanent injuries. Brown & Root settled Smith's claim for $75,000 and is seeking to recover from Underwater that sum, plus reasonable attorneys fees and miscellaneous disbursements.

The theory of the third party complaint is that Underwater breached an implied contractual obligation to perform its services in a good and workmanlike manner, thereby causing Smith's injuries and making Brown & Root potentially liable to Smith by reason of Brown & Root's non-delegable obligation to furnish a seaworthy vessel.

 It is now settled that when a stevedore enters into a service agreement with a ship, there is an implied contractual warranty on the part of the stevedore to perform in a workmanlike man-

ner. It is equally well settled that if a ship can show that the stevedore's breach of warranty has occasioned its expenses, reimbursement is due. Italia Soc. etc. v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Weyerhaeuser S. S. Co. v. Nicirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); Ryan Stevedoring Co. v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The landmark case was Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) which held that a stevedore whose exclusive remedy against his employer was under the Longshoremen's Act could sue the non-negligent shipowner to recover damages for unseaworthiness. The Court held that Sieracki was a seaman on the ground that he was doing a seaman's work and incurring a seaman's hazards and was therefore entitled to the seaman's traditional and statutory protections. In Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953) the Supreme Court stressed that the doctrine covered types of harbor workers other than stevedores. In holding that a carpenter could recover for injuries resulting from the unseaworthiness of the ship, the Court stated that its decision was based on the type of work done, its relationship to the ship, and the employee's need for protection from unseaworthiness.

 Although there is a paucity of authority on the status of marine divers as "seamen", we have no hesitancy in holding that the plaintiff Smith was entitled to the seaman's traditional and statutory protections, regardless of the fact that he was employed immediately by someone other than the vessel owner (Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872; Pope and Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 143). Smith was a skilled sea diver employed by Underwater for the purpose of performing a highly specialized function. His work aboard and in furtherance of the vessel's mission was of a nature which required particular skills, knowledge and expertise possessed only by other persons of his calling. Neither he nor any other diver was subject to any supervision or control by Brown & Root in the details of their work. It is equally clear that the nature of Smith's work was maritime. Certainly, his duties which required him to descend to the ocean floor, in waters of approximately 186 feet in depth and 80 miles from shore, were maritime in nature. Brown & Root owed to Smith a non-delegable duty to furnish a seaworthy vessel and equipment. The factual situation presented here and the subsequent payments by Brown & Root to Smith present an analogous legal relationship to that which was before the Supreme Court in Ryan. The injured plaintiff is limited by law in the amount that he can recover from his employer, because of the Longshoremen's Act, which applies to both the stevedore in Ryan and to this tidelands worker covered by the Outer Continental Shelf Act. Section 1333(c) of the Continental Shelf Lands Act especially adopts the Longshoremen's Act and preserves the harborworker's right of action against the third party. There is ample shelter under the Ryan doctrine for stevedores, carpenters, roughnecks and divers, so long as the injury was a result of the unseaworthiness of the ship they served. We are asked, however, to distinguish this case from Ryan. It is pointed out that Ryan was a stevedore and that Smith was not. This is a distinction without a difference. In Ryan, the shipowner's right to indemnity was not based on the nomenclature "stevedoring contractor," but upon the implied warranty of the independent contractor to the shipowner to perform the job in a workmanlike manner. The application of the Ryan doctrine is especially apposite to Smith's situation, because it carries forward the principles of the federal maritime law set forth there where the Court spoke of competency and

safety of performance, as being inescapable elements of the stevedoring service. How much more so should there be inescapable elements of this most dangerous diving operation? The shipowner, in his desire to insure the seaworthiness of the ship and the safety of the diving operations, contracted for the expert services of Underwater. Brown & Root had deferred to the qualifications of the diving company in the selection and use of equipment, and placed its reliance on the competency of their operators. Surely, Underwater was in a far better position than the shipowner to take the necessary precautions which would have avoided this unfortunate accident. Accordingly, Brown & Root has a cause of action against Underwater for amounts paid in settlement of Smith's personal injury claim if the settlement was reasonable under all the circumstances, and if the injury was caused by a breach of Underwater's warranty of workmanlike service. Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); Shannon v. United States, 235 F.2d 457 (2 Cir., 1956); American President Lines, Ltd. v. Marine Terminals Corp., 234 F.2d 753 (9 Cir., 1956), cert. denied 352 U.S. 926, 77 S.Ct. 222, 1 L. Ed.2d 161; Lilleberg v. Pacific Far East Line, Inc., 167 F.Supp. 3 (N.D.Cal.1958).

Taking into consideration that which we all know—the almost insurmountable difficulties attending Brown & Root's defense against Smith's claim—it cannot be said that Brown & Root made other than a fair and reasonable settlement of its potential liability. To have resisted settlement to the point of a trial would have been sheer folly. Smith is now a paraplegic. He will never walk again. We feel that the record preponderates to the effect that Smith's very serious and permanent injuries were sustained as a result of injury-producing defective equipment supplied by Underwater in furtherance of its implied contractual obligations.

## FINDINGS OF FACT

1. Underwater Services, Inc., an independent marine diving contractor, entered into an oral contract with the Brown & Root Marine Operators, to perform certain diving services in connection with the salvage of an offshore drilling platform that had been severely damaged by Hurricane Carla in early September, 1961.

2. Mr. Donald Essmeier, an employee of Continental Oil, and the owner of the damaged drilling platform, called and made the contractual arrangements with Underwater and informed Underwater's representatives, including Mr. Warriner, its president, of the nature of the task to be undertaken, and that he was hiring the defendant in behalf of Brown & Root Marine Operators.

3. Mr. Essmeier was assured by representatives of Underwater that it could furnish competent personnel and proper equipment for the job.

4. Underwater's personnel and equipment were picked up at Morgan City and transported to the LINDSAY where they arrived on the morning of September 20, 1961.

5. Mr. Warriner acknowledged that his company (Underwater) took this diving job as an independent contractor of Brown & Root.

6. Pursuant to its contract, Underwater brought aboard and used in its diving operations two small portable air compressors; an air tank to hold compressed air for the divers; a burning torch; an electric cable; an oxygen hose for underwater cutting; and various other items of diving equipment including masks, lifelines, air lines, weight belts and underwater communications equipment.

7. The air storage tank was equipped on one end with fittings for connecting the tank to the portable air compressors. A short pipe, ¾′ in diameter, was connected directly to the end of the tank. On the opposite end was a T-shaped fit-

ting with two openings at right angles to the base of the T and the pipe connecting it to the tank. On one side of the T was installed an automatic check valve or non-return valve to prevent air from passing out of the tank and a coupling for connecting a flexible rubber hose to one of the portable compressors. On the opposite end of the T was an ordinary, manually operated gate valve and another coupling for connecting a flexible hose to the second compressor. This hookup of the two compressors and the air storage tank was an integral unit with both compressors operated simultaneously to supply air for the storage tank.

8. The air storage tank, the rigid connections affixed thereto, the two flexible hoses and the two portable compressors were supplied by the defendant, although one of the compressors and one of the flexible hoses were owned by Roy Smith.

9. On the afternoon of September 21, 1961, Roy Smith and Robert McGuire, divers supplied by the defendant, commenced a dive to a depth of 186 feet to perform underwater cutting operations. Mr. Smith's air hose which supplied his air for diving was connected to Underwater's storage tank. The air in the storage tank was supplied by the portable compressors which had been adjusted by defendant's personnel to maintain pressure in the tank at approximately 160 to 165 pounds per square inch. Mr. McGuire's air for diving was supplied by plaintiff's barge air system and was in no way connected to defendant's portable air storage tank.

10. Smith was tended during his dive by Arthur Cormier and McGuire by Frank Anderson. Both tenders were furnished for these diving operations by defendant.

11. McGuire entered the water first and Smith followed immediately. They went down the descending line which was attached to one of the pilings to a depth of about 80 feet and then followed the curved piling (bent by the hurricane) to the bottom. McGuire was on the bottom doing the cutting and Smith was just above him holding his cutting hose. Shortly after reaching the bottom the hose supplying oxygen for the cutting torch broke and Smith, pursuant to instructions from his tender, started up to a shallower depth to conserve his working time at the 185-foot depth.

12. Just about the time Smith reached a depth of about 80 feet, the air hose connecting one of the compressors and the storage tank which held his air supply blew off of the coupling attached to the compressor. There was no check valve on that side of the T leading to the compressor. The air in the storage tank, which was under a pressure of 160–165 pounds per square inch, started blowing violently, making a noise like something exploding. The end of the hose emitting the air was twisting violently around on the deck and kicked up a cloud of dust.

13. Immediately after the hose blew off and during the excitement that followed, one of the tenders at the rail started calling for help to pull Smith to the surface. After Cormier had already pulled Smith up about 15 or 20 feet, he received assistance in his rescue attempts from a man with a beard and his brother (the Poole brothers), and another man about six feet tall who was never identified. Mr. Carroll, the president of J. & J. Marine Diving Service, another independent diving contractor, and Mr. Moore, an employee of Brown & Root, rushed to the air storage tank and managed to catch the hose that was whipping around on the deck. They doubled it up to stop the flow of air and closed the gate valve in time to conserve about seventy pounds of air in the tank.

14. All of these events happened within a period of from fifteen to eighteen seconds, and Smith reached the surface just about the time the valve on the storage tank was closed.

15. When Smith reached the surface, he climbed up the ladder—a distance esti-

mated at 8 to 10 feet—to the deck of the barge. He removed his diving gear and sat down on a hatch cover. He experienced numbness across his buttocks and back, and was told by his tender that they would put him in the recompression chamber as soon as McGuire reached the surface. McGuire came up and went into the chamber with Smith.

16. When Smith came out of the chamber he was unable to walk and was carried to a bunk downstairs in the crew's quarters where he stayed until a helicopter arrived to take him ashore for treatment. After a stop for fuel in Morgan City the helicopter arrived at Ochsner's Clinic in New Orleans about 7:00 P.M. where Smith was examined and treated by Dr. Weeth and Dr. Jackson. Although a recompression chamber was available, Smith was not recompressed or treated for the bends until October, 1962, approximately thirteen months after the accident.

17. When Smith was first examined at Ochsner's Clinic on September 21, 1961 he was paralyzed in his lower extremities; not completely paralyzed, but had lost about 80% of the function of the lower extremities, sensory-wise and motor-wise. X-rays taken of his spine revealed no broken bones. A spinal tap made on September 22nd—the day after the accident—revealed no pressure on the spinal cord, and a myelogram performed the following day was completely normal.

18. Smith will be a paraplegic, paralyzed from the fifth thoracic dermotome level for the rest of his life. The diagnosis of traumatic paraplegia simply means that Smith developed nitrogen bubbles in the spinal cord which caused him to develop physiologic transection of the spinal cord. The spinal cord was not bruised, there were no bones broken, no disc dislodgment and the myelogram was normal.

19. Brown & Root settled Smith's claim by payment to him of the sum of $75,000, and now seeks to recover that sum from defendant, plus reasonable attorneys fees and disbursements incurred in the defense of Smith's suit.

20. The evidence convinces me that Smith's condition resulted from the failure of Underwater's equipment which necessitated his ascent without stops in the water for proper decompression.

21. It is alleged that a continuing cause of his injury was the improper treatment by personnel furnished by Underwater's tenders, who were untrained in caring for the divers. We find, however, that the question of whether Smith would or would not have recovered completely (if given proper decompression) or at all is conjectural, and that the real proximate cause of this unfortunate occurrence was the failure of Underwater's equipment.

22. A reasonably prudent diving contractor would have seen to it that a check valve was in the line between the compressor and the volume tank. The failure to equip both sides of the "T" connecting the volume tank to the compressor with check valves was a breach of Underwater's duty to furnish reasonably safe equipment, and this breach was the proximate cause of the damages sustained by Smith.

23. The failure of this equipment created a sudden emergency which jeopardized the life of Smith, and the actions of Brown & Root's employees "in helping pull Smith up" were but the normal response of men voluntarily rendering assistance to the situation created by such failure.

24. We reiterate, we find that the evidence fails to establish that proper decompression would have rectified Smith's condition, but we do hold as a fact that the decompression of Smith was the responsibility of Underwater Services, Inc., which purportedly possessed the skill and expertise to carry out all phases of the diving operation and cannot disclaim responsibility for improper treatment of Smith on the barge by abdicating this responsibility to a third party. The decompression chamber belonged to Bailey and it was simply made available

for the use of the various diving contractors, and the evidence reveals that in accordance with established and customary practices it was to be operated by the employees of the particular contractor using it at any given time.

## CONCLUSIONS OF LAW

■ 1. A marine diver, whose duties required him to descend from his ship to the ocean floor in waters of approximately 186 feet in depth and 80 miles from shore, is entitled to a seaman's traditional and statutory protections.

■ 2. The existence of a contract between an independent diving contractor and a shipowner leads to the recognition of an implied warranty of workmanlike service, the breach of which leads to the implied promise by the independent contractor to indemnify the shipowner for the consequential damages resulting from the breach.

■ 3. To recover indemnity from the party actually responsible for creating the condition of unseaworthiness the shipowner needs only to show here that it was "potentially liable", and that the amount of the settlement was reasonable. Damanti v. A/S Inger, 314 F.2d 395 (2 Cir. 1963); Paliaga v. Luckenbach Steamship Company, 301 F.2d 403 (2 Cir. 1962); Caswell v. K.N.S.M., D.C., 205 F.Supp. 295, later opinion, 223 F.Supp. 102 (S.D.Tex.1962), aff'd. 324 F.2d 746 (5 Cir. 1963), cert. den. 376 U.S. 954, 84 S.Ct. 969, 11 L.Ed.2d 972.

## CONCLUSION

Brown & Root Marine Operators is entitled to recover from the third party defendant herein the sum paid to Roy Inman Smith in settlement of his claim, plus reasonable attorneys fees and expenses of defending Smith's suit, together with interest thereon. Counsel for Brown & Root should submit forthwith a judgment in accordance with the foregoing Findings of Fact and Conclusions of Law.