**Richard D. HANKS**

v.

**The CALIFORNIA COMPANY.**

**Civ. A. No. 9795.**

United States District Court
W. D. Louisiana,
Lafayette Division.

Nov. 9, 1967.

Domengeaux, Wright & Bienvenu, Bob F. Wright, Lafayette, La., for plaintiff.

McLoughlin, Barranger, West, Provosty & Melancon, Lloyd C. Melancon, New Orleans, La., for defendant.

Davidson, Meaux, Onebane & Donohoe, John Allen Bernard, Lafayette, La., for third party defendants, Universal and Travelers.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert Acomb, Jr., New Orleans, La., for Universal Services and Travelers.

Adams & Reese, George V. Baus, New Orleans, La., for Noble Drilling Corp., and Aetna Casualty & Surety Co.

## OPINION

PUTNAM, District Judge.

This is a companion case to Hebert v. California Oil Co., D. C., 280 F.Supp. 754, in which our decree was handed down this day. Plaintiff Hanks, whose immediate employer was Universal Services, Inc., filed suit against defendant, California Oil Company, for injuries received while working aboard a drilling tender owned and operated by California, providing supporting services for a drilling operation of that company being conducted from a stationary platform located on the outer continental shelf, in the Gulf of Mexico.

Hanks sued only California, alleging acts of negligence and the unseaworthiness of its vessel, the M/V S–24, which caused his injuries. California filed third party demands against Noble Drilling Corporation and its insurer, Aetna Casualty and Surety Company, and Universal Services, Inc., and its insurer,

The Travelers Insurance Company, claiming indemnity. By cross-claims and additional third party demands brought by these litigants against each other and Fireman's Fund Insurance Company, insurer of California, all parties are before the court and the identical issues made as were raised in *Hebert,* supra.

The injuries suffered by Hanks were serious and were compromised by payment of $43,000.00 by California, which amount was stipulated to be a reasonable settlement of the claim, commensurate with the injuries sustained by plaintiff, with reservation of all rights of third party litigants under the pleadings and pretrial stipulations. The matter was submitted for decision after filing of briefs.

The contractual and insuring agreements set out fully in the Hebert case are identical to those presented here. We will not reiterate them herein except as may be necessary. Our factual determinations in this case, based upon the record submitted, follow.

The M/V S–24 is a converted LST of the type developed for and widely used in amphibious operations in World War II. The galley is located on the first deck, and the refrigeration spaces on the third deck, aft of the drilling mud room, tanks, pumps and hoppers, on the starboard side. The accident occurred in the meat locker or "reefer" box, where frozen meats are stored. Hanks was chief steward of the crew furnished to California by Universal to man the galley and provide steward's service to others aboard the vessel. He went aboard the S–24 in April of 1962, as first cook, working regular shifts until the date of the accident on November 1, 1962; he was promoted to chief steward about six weeks after reporting for duty. He held seaman's papers and was "signed on" by the captain, but copies of the articles, if any, are not in the record. We entertain no illusion that they were articles as required for blue water sailors on ocean-going vessels.

Stores had come aboard on November 1st. As part of his job, Hanks was seeing to storage. He was working with packages of meat weighing between fifty and a hundred pounds. These supplies were lowered to the third deck through a hatch by means of a boom located topside, transported to the dry provision room using a hand truck or dolly and unloaded by hand, stacked in the provision room, then again moved manually into the "vestibule" or thaw room where they were stacked in preparation for moving them into the freezer itself.[1] After the thaw room door was closed, the boxes were again moved and stacked in the "reefer" or freezer box.

According to Mr. Stickney, a marine surveyor who measured the box, the working space consisted of a passage approximately three feet wide and fifteen feet long, running between shelves eighteen inches in depth, from deck to overhead. The headroom in this compartment is five feet one and one-half inches. Hanks was five feet nine inches tall and weighed about 195 pounds. He was in the freezer box, engaged in shifting large cartons of meat and poultry about, opening them and stacking the individual packages contained therein on the shelves. Old stores were moved up so that the supplies would be rotated, to minimize loss from dehydration or "freezer burn".[2]

Two men moved the cartons to the freezer door, but the space was not sufficient for more than one man to work inside the box itself. After getting into the box, "it was all stooping and bending because you couldn't stand up.[3]" He was bending forward to move a box weighing about 80 pounds out of the doorway, when it hung on the corner of another box, causing him to jerk forward. He states it was then that he felt a "catch" in his back.[4] His foot slipped, but he is unable to say whether this was before

---

1. Depositions, Stickney, Attachment 2; Hanks, pp. 8, 9, 10.

2. Hanks deposition, pp. 6, 13.

3. Hanks deposition, p. 10.

4. Hanks deposition, p. 5.

or after he felt the pain in his back.[5] He fell forward, twisted and "just sat down on the box".[6] After sitting there for a while, he told the two men working with him, both members of the Universal crew, that he had hurt his back, then went topside to his quarters where he proceeded to examine the invoices for the stores received that day.[7] He remained on the job attending to his normal supervisory duties for about eight days, then went ashore for his customary break. He also reported the fact of his injury to the acting master, Captain Gettel, who entered it in the ship's "medical log".[8]

A considerable portion of Hanks' testimony was devoted to conditions in the refrigeration rooms and storage area which would tend to show that at times other crew members aboard the tender would track drilling mud through the engine room and in the passageways in which they worked, "some of which might have been brought into the 'reefer' box on his shoes"; that when it was raining the hatch remained open and they had to move the stores to one side, and that sometimes the deck in the freezer was damp and slippery. We cannot find any positive testimony in his deposition that these conditions existed on the day of the accident, and must regard the testimony as window dressing. The wood grating in the box itself was covered with cardboard by Hanks and his crew to keep it clean, simply to minimize their own work in this respect. Captain Gettel's testimony was that he went to the area after the accident was reported to him and at that time the deck of these working spaces was clean.[9]

As chief steward, Hanks was in charge of this operation. He was custodian of the keys to the provision rooms, including refrigeration spaces. The men working with him at the time of his accident were under his direction, and the crowded condition of the storage area was due to the method he employed to get the stores out of the heat and under refrigeration as soon as possible. The manner in which the provisions were packaged was under the direction of Universal's agents ashore, as well as the quantity of stores sent out, according to the Noble-Universal contract, which we presume was followed, absent evidence to the contrary.

Hanks complained to his superiors with Universal about the crowded working conditions. The nature of his complaints is vague. The first one to which he alludes was purportedly made to a Mr. Ball who came aboard to check the icebox for cleanliness, etc. This gentleman was a tall man and cut his head when he ran into one of the circulating fans in the icebox. He was, in Hanks' words, " * * * quite outdone about that," and we suspect that Hanks' complaints were more in the nature of sympathizing with his superior, for he says that Mr. Ball did not tell him anything, "He just did a lot of cussing about his head being cut. I just said that there should be something done and I don't know what he told me * * *." He states further that he told two other Universal supervisors, that it was just "difficult to work in those boxes," and they replied simply that they did not know what could be done about it.[10]

He did not complain to the Master or to any of the California officers on board the S–24 about the working area being unsafe or the vessel unseaworthy because of the cramped quarters arising out of the vessel's construction. The men under him complained, and he did speak to the chief engineer of the vessel, but the tenor of this testimony is that they discussed beween themselves the common problem their respective departments had to keep their areas of the ship clean because other members of the crew and personnel aboard were required

5. Hanks deposition, p. 7.

6. Hanks deposition, pp. 11, 12.

7. Hanks deposition, p. 13.

8. Gettel deposition, pp. 6, 7.

9. Gettel deposition, p. 63.

10. Hanks deposition, pp. 27, 28 and 29.

to use the passageways and the after-ladder leading topside to go through the "hole", as he termed it, an obvious reference to the 'tween decks hatch. In the process they tracked drilling mud and grease on the decks, thus increasing the work of the galley and the engine-room hands. This is a continual process aboard a drilling tender, particularly when the mud pumps supplying drilling mud to the platform rig were operating. As we have said, this equipment was installed on the same deck level as the refrigeration and storage compartments, refrigeration equipment being in the sphere of the chief engineer's responsibility.[11] We do not believe that these conversations were notice to California of any purported unsafe condition of its vessel, and the refrigeration space in particular.[12]

Captain William F. Gettel testified that he was acting Master of the S–24 at the time of the accident. The inconsistency of his position as master, with responsibility for the control of the vessel's operational activities and the safety of the ship's crew, and the theory advanced by California that he had no control over the activities of Universal's employees in operating the galley and maintaining the supply rooms aboard ship, is clearly demonstrated throughout his depositions. He conducted regular inspections of all departments of his ship;[13] if he saw anything out of order he gave orders to correct it. He did not personally attend and supervise every shipboard activity, but the right to control was ever present and inherent in the relative positions of the parties by virtue of every principle affecting shipboard authority. We have fully commented upon this in *Hebert*, and feel that further elaboration at this time is unnecessary.

In the pretrial stipulation it was admitted that Hanks was a member of the crew of the vessel, a status that would be most difficult to deny under the facts of this case. Offshore Co. v. Robison, 5 Cir. 1959, 266 F.2d 769, 75 A.L.R.2d 1296; Producers Drilling Co. v. Gray, 5 Cir. 1966, 361 F.2d 432; and Marine Drilling Co., Inc., et al. v. Autin, 5 Cir. 1966, 363 F.2d 579, fully discuss all of the jurisprudence in this area and the test to be employed in submersible barge cases and cases involving other special purpose craft; the status is even more well defined here as Hanks was chief steward on a more or less permanent basis, aboard a self-propelled documented vessel moored to a stationary platform, providing services to a drilling rig in support of the drilling operation conducted on such platform. See: Johnson v. Noble Drilling Co., W.D.La.1966, 264 F.Supp. 104, and Creel v. Drill Tender Jack Cleverly, W.D.La.1966, 264 F.Supp. 98, in which the function of such tenders are fully described.

■ Plaintiff's suit was for a total of $212,500.00. The compromise figure above mentioned necessarily takes into account all of the issues between the claimant and California, including reduction of any award by virtue of Hanks' contributory negligence. Hanks' complaint unlike that of Hebert in the companion case affecting the submersible drilling barge S–55, does not specifically allege the "borrowed servant's" status in his suit against California, to establish the employer relationship necessary for a claim under the Jones Act, 46 U.S.C.A. § 688.

■ Prior to the compromise, in the pretrial stipulation filed by all parties, Hanks states his position to be that of

---

11. Hanks deposition, pp. 29, 30, 31; Stickney deposition and report, Attachments 1 and 2.

12. Notice to the owner of such a condition is, of course, not required for his liability if unseaworthiness resulted. Mitchell v. Trawler Racer, Inc., 1960, 362

U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; Waldron v. Moore McCormack Lines, Inc., 1967, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482. Its mention here is solely in connection with plaintiff's claims of negligence.

13. Gettel deposition, p. 29.

an employee of Universal working on a vessel owned by California, who was injured by virtue of the negligence of that defendant and/or the unseaworthiness of its vessel. It was agreed in Paragraph V of the stipulation that he was, at all times pertinent, acting in the course and scope of his employment on the vessel, pursuant to the terms of the contracts between these parties, and that he was a member of the crew thereof. Universal advanced the contention in Paragraph VI, that he was a borrowed servant of California this issue being contested by California and Noble but not by Hanks. The allegations of plaintiff's complaint that he was an employee of Universal would not preclude him from showing that he was also an employee of California at the time of his injury. Porter v. St. Louis-San Francisco Railway Co., 5 Cir. 1966, 354 F.2d 840. See also Restatement 2d, Agency, §§ 220, 226, 227, and comments; cf. Cimorelli v. New York Central RR, 6 Cir. 1945, 148 F.2d 575.

■ The borrowed servant status being clearly delineated as an issue in the case, although not specifically advanced by the injured seaman, must, in the opinion of the court, be resolved in favor of the contentions of Universal, for the reasons stated hereinabove and more fully in the memorandum opinion filed by this court in the *Hebert* case. His personal services were "rented" to California while aboard its vessel. Standard Oil Co. v. Anderson, 1909, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Linstead v. Chesapeake & Ohio Ry. Co., 1928, 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453; Baker v. Texas & Pacific Ry. Co., 1959, 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756; Compare, Shenker v. Baltimore & Ohio R. Co., 1963, 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709; Porter v. St. Louis-San Francisco Ry. Co., supra.

■ Under our interpretation of the California-Noble contract the latter company acted merely as a hiring agent for the former in procuring an independent contractor to undertake responsibility for the day to day operation and maintenance of the galley and living quarters of the M/V S-24, with California's approval and consent. We again conclude that Noble satisfied its contractual obligations to California in respect to the galley operation when this was done. Hebert v. California Oil Co., supra. The third party demands against Noble and Aetna, therefore fall, as this phase of the total enterprise did not come within the scope of Noble's operations. The provisions of the contractual indemnity of Noble to California and the insuring agreements are fully set out and discussed in *Hebert*, and we do not repeat them. But our findings in regard to Universal in that case do not apply here.

Universal operates what is generally termed a "catering service" in the offshore oil industry of this area. This is not a local business by any means insofar as this particular corporation is concerned, as may be easily ascertained by reference to the wide geographical coverage of the Travelers policy issued to it in this case. Its business consists of procuring provisions and supplies to operate, maintain and keep in working order the galley, storerooms, living quarters and dining facilities, recreation rooms, heads, showers and other accommodations for members of the ship's crew and visiting personnel. Rigorous sanitary and health requirements are exacted by the shipowner. In addition, the caterer furnishes men to perform these operational activities of the vessel; they are assigned to the ship and serve subject to the ship's discipline, formal or informal, under the control of the owner's representatives on board. The chief steward is in charge of the galley, its provisions and other supplies aboard the ship, and answers to the captain or master for breach of discipline or substandard performance of the duties of this departmental activity. They are also responsible to and serve the business interests of their immediate employer, who reaps a profit from the physical labor they perform aboard ship. The interests of the shipowner and the

catering contractor in respect to the performance of the work of the galley crews aboard these offshore vessels are identical; there is no conflict, particularly in regard to the duties Hanks was performing when his injury occurred.

Thus, caterers, drilling contractors, and other service organizations, who furnish manpower for service aboard special purpose vessels operating off our coasts in the production of oil and gas provide valuable and convenient sources of labor to oil companies, ready and able to commence operations when and where desired on short notice. The shipowner is relieved of the necessity of maintaining a full crew aboard during periods of inactivity in the field; crew members are kept employed on a more or less regular basis, the contractor makes a profit on a per meal basis, as is the case before us, or on a day rate basis as is provided for in other instances. All are happy until the question of liability for the cost of inevitable industrial accidents to the employee makes its entrance upon the scene.

■ It has now been made clear that when the operator of a vessel (or railroad) engages the services of an independent contractor to perform operational activities of the ship, that contractor falls within the scope of the word "agent" as employed in the Federal Employers' Liability Act, Sec. 1, 45 U.S.C.A. § 51, and a claim for injuries resulting to a crew member employed by the owner by reason of the negligence of the contractor's servants cannot be defeated by interposition of concepts of responsibility flowing from the contractual relationship between employers. Thus, the employees of the contractor become agents of the operator in the discharge of the latter's operational activities, those necessary for the fulfillment of the vessel's mission or the railroad's franchise. Sinkler v. Missouri Pacific Railroad Co., 1958, 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799; Shenker v. Baltimore & Ohio R. Co., 1963, 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709; Hopson v. Texaco, Inc., 1966, 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740. The obligation of the owner to respond to his employees in damages for negligence, imposed by the Jones Act, 46 U.S.C.A. § 688 and the Federal Employers' Liability Act, supra, cannot be shifted.

■ Where, as we find here, the *contractor's* employee is also a "rented" or "loaned" servant of the *operator,* and is further a member of the crew of the vessel, his right to damages for negligent injury against *the employer pro hac vice* is not restricted to recovery in tort under the general maritime law. To so hold would effectually deprive him of his legislatively conferred status as a "member of the crew" under the Jones Act, as it has been interpreted in conjunction with the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., and other statutes. Offshore Co. v. Robison, supra; Producers Drilling Co. v. Gray, supra; Marine Drilling Co., Inc. v. Autin, supra.[14]

■ We turn next to consideration of the claim based on unseaworthiness of the vessel. The record does not contain any evidence upon which the court could predicate a finding that the size of the freezer box of the M/V S–24, standing alone, was so out of keeping with the intended use thereof as to give rise to a condition of unseaworthiness, in violation of the absolute duty of the shipowner to supply a vessel reasonably

14. This conclusion at once suggests the possibility of indemnity through contribution between joint tort feasors in a proper case, for the statutory scheme in the longshoreman v. shipowner v. stevedore situation presented to the court in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 1952, 342 U.S. 282, 72 S. Ct. 277, 96 L.Ed. 318, followed in Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, would be no obstacle. The injured member of the crew would have the same remedy against his immediate employer. See, Boatel, Inc. v. Delamore, 5 Cir. 1967, 379 F.2d 850. We do not reach this question in this case for reasons which are apparent. The court is thankful for this small favor.

fit in hull, gear, appliances, appurtenances and manpower, which results in liability without fault. Richter v. Mathiasen's Tanker Industries, Inc., 2 Cir. 1961, 297 F.2d 494, cert. den. 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847, reh. den. 369 U.S. 891, 82 S.Ct. 1156, 8 L.Ed. 2d 291. Under various operating conditions and uses, however, a ship or its gear that *is* otherwise seaworthy may become momentarily unseaworthy, particularly by the improper use of its appliances, without reference to negligence in such operation. Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; Mahnich v. Southern S. S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Mascuilli v. United States, E.D.Pa.1960, 188 F.Supp. 754, 3 Cir. 1963, 313 F.2d 764, on remand 241 F.Supp. 354, second appeal, 3 Cir. 1966, 358 F.2d 133, cert. granted, rev'd and remanded May 22, 1967, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743, without notice to or knowledge of the owner of such transitory condition, Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; and even for the assignment of insufficient manpower to the performance of a single manual task on an otherwise well-manned ship, Waldron v. Moore-McCormack Lines, Inc., 1967, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482. See and compare: Dugas v. Nippon Yusen Kaisha, 5 Cir. 1967, 378 F.2d 271; Antoine v. Lake Charles Stevedores, Inc., W.D.La.1965, 249 F.Supp. 290, aff'd 5 Cir. 1967, 376 F.2d 443; cert. den. 389 U.S. 869, 88 S.Ct. 145, 19 L.Ed.2d 146; Robichaux v. Kerr McGee Oil Industries, Inc., 5 Cir. 1967, 376 F.2d 447, and the exhaustive treatment of the jurisprudence contained therein.[15]

▆▆▆▆▆▆ We have no difficulty in concluding that at the time of the acci-
dent an unsafe condition was created by jamming the large quantity of supplies into the freezer box by Hanks and his galley crew, which momentarily, instantaneously and transitorily rendered the vestibule and the freezer compartments unfit for one man to work safely within the freezer unit to complete stowing these provisions. It is not necessary that anyone be negligent for the shipowner's liability for unseaworthiness to attach. Mitchell v. Trawler Racer, Inc., supra, as explained and clarified in Morales v. City of Galveston, 1962, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412. The law is clear, however, that unseaworthiness may be brought about by conduct amounting to negligence. This does not change the nature of the suit to recover therefor, or the criteria by which the fact of its existence must be determined.

▆▆▆▆ To recover indemnity from the party actually responsible for creating the condition of unseaworthiness, or other grounds providing the basis of liability of the shipowner in tort to an employee, the latter need only show potential liability and the reasonableness of the settlement. Smith v. Brown & Root Marine Operators, Inc., W.D.La. 1965, 243 F.Supp. 130, aff'd per curiam, 5 Cir. 1967, 376 F.2d 852, and authorities cited 243 F.Supp. at 136.

In the instant case, it is clear that Hanks' claim against California exposed that company to potential liability for his damages under the Jones Act or general principles of maritime tort, and for unseaworthiness. Had the settlement not been concluded, a trial by jury of the issues we have discussed could easily have resulted in a recovery far in excess of the sum paid. We are in full agreement with the stipulation that the sum paid was reasonable, and are bound by it.

---

15. Whether or not the condition under scrutiny amounts to unseaworthiness of the vessel depends upon the individual circumstances of the case. Morales v. City of Galveston, infra. We do not believe that we are concerned in this case with the "operational negligence" vs. "instantaneous unseaworthiness" debate reflected by the decisions last cited. We reiterate what was pointed out in footnote 1 of Hebert v. California Oil Co. et al., that we think *Mitchell* and *Waldron,* supra, resolve this controversy.

The provisions of the contract will govern California's claim for indemnity against Universal in this case. As pointed out above, our conclusion is that Noble was the agent of California in negotiating the agreement for the latter's account, and that Universal tacitly, if not expressly, recognized and acknowledged this relationship in its dealings with California over the years under this arrangement. The contention that there was no privity of contract between them raised by Universal is without merit.[16]

The Universal contract contained the following express indemnity provision:

> "Contractor shall hold Operator free and harmless from any and all liability, costs and charges, arising out of injuries or damage to any and all persons, employees and/or property in any way resulting from acts or omissions of Contractor, or subcontractors, in *conducting its operations hereunder.*" (Emphasis supplied.)

California's contract with Noble required the latter to obtain insurance coverage against California's liability to any Noble employee or third person injured as a result of the drilling operation. Noble, with California's consent and approval, negotiated the Universal contract and required the latter to furnish California with insurance policies acceptable to it to cover liability arising from the galley operation. The Universal contract had been in effect covering the M/V S–24 since June 19, 1959. The entire contractual scheme evidenced by these rather lengthy and detailed documents demonstrates that the parties intended to and did fix responsibility to employees and others for damages, as *between themselves,* in terms of their operational activities aboard the vessel. Noble was responsible to those whose injuries were caused by the drilling operation, Universal for those caused by its operation of the galley.

It was Universal's obligation to render the service it contracted for in a workmanlike manner, and the contractual provision above quoted simply expresses the duty to indemnify for the negligent breach of its contractual obligations, which would otherwise be implied.[17]

The record shows that the quantity of provisions sent aboard the vessel, the size of the packages to be handled by the galley hands, the time of shipment and other logistical details were attended to by Universal's officers and employees ashore. It is also shown that Universal had actual notice of the size of the facilities that were available on board ship, their location, and the fact that frozen foods had to be placed under refrigeration as quickly as possible. That these elements were substantial factors in causing the unseaworthy condition of the freezer box seems to us to be apparent. As the logistics for the steward's department of the vessel were part of Universal's obligations, sending aboard more provisions than could be efficiently handled by the galley personnel and the existing facilities of the ship, was, we find, a substandard performance of Universal's contractual obligations.[18]

16. Even without privity of contract between California and Universal, the indemnity clause of the contract would inure to the benefit of the shipowner, as in stevedoring contracts negotiated by a time charterer. Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413.

17. In our opinion the case of Ryan Stevedoring Co., Inc. v. Pan-Atlantic SS Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, and its progeny would apply here, at least as to any unseaworthy condition of the vessel attributable to breach of the contractual duty resulting in injury to one of Universal's employees, even though the employee might, at the same time, be a rented or loaned servant of the shipowner. Compare: United States v. Tug Manzanillo, 9 Cir. 1962, 310 F.2d 220.

18. Under Lusich v. Bloomfield Steamship Company, 5 Cir. 1966, 355 F.2d 770, the negligence of Hanks and his galley crew in jamming the small box with supplies so as to cause an unseaworthy condition might also be charged against Universal as a breach of its contractual obligations

On the other hand, we found that the sole proximate cause of the injury to the plaintiff in the *Hebert* case flowed from other operations being carried on aboard the vessel, which were *not* within the scope of Universal's "operations", did *not* constitute a breach of its contractual obligations, and in consequence there was no express or implied obligation to indemnify. Here, however, the situation is the opposite. California is not seeking indemnity for the effects of its own negligence in this instance. It is also the court's opinion that the conduct of California was not sufficient to prevent Universal's performance of its contractual obligation in a workmanlike manner, so as to preclude indemnity under these facts. Compare: Loffland Brothers Co. v. Roberts et al., 5 Cir. 1967, 386 F.2d 540, where the indemnity provisions before the court were strikingly similar to those at bar, with recovery even allowed for injuries arising out of the indemnitor's operations.

For the foregoing reasons, we hold that California is entitled to recover on its third party demands against Universal.

For the reasons stated in full in Hebert v. California Oil Co., California's third party demands against Noble, Aetna and Travelers are denied.

Noble's third party demand against Universal cannot stand under the indemnity clause for the reason that it is not within the scope thereof and Noble was not called upon for damages by the original plaintiff, Hanks.

Noble's demands against Travelers, however, because of the specific undertaking of this insurer set out in endorsement 1721A(M) of its policy, will prevail and Noble may recover attorney's fees and costs expended by it in defense of California's action.

Travelers' cross-claim against Aetna and third party demand against Firemen's Fund are denied.

to California to attend to proper storage of its supplies aboard the ship. The

A formal decree will be prepared and submitted in keeping with the foregoing and pursuant to Rule 9(e) of this court. Judgment will not be entered by the Clerk until signing of the decree by the court.

court prefers not to rest this decision on this ground.