Earline **WHISENANT**, individually and as Tutrix of Her Minor Children, Sheila Dianne Whisenant, Michael Earl Whisenant and Rebecca Lynn Whisenant

v.

**BREWSTER – BARTLE OFFSHORE COMPANY**, Travelers Insurance Company and Texaco, Incorporated.

**Civ. A. No. 15915.**

United States District Court, E. D. Louisiana, New Orleans Division.

June 15, 1970.

Thomas W. Thorne, Jr., of Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for intervenor.

Philip E. Henderson of O'Neal, Waitz & Henderson, Houma, La., for defendants.

COMISKEY, District Judge.

## MEMORANDUM OF REASONS

Ray Whisenant, an employee of Loomis Hydraulic Testing Co., Inc. (Loomis) was killed instantly on September 8, 1964 while working aboard the Brewster-Bartle Rig No. 14 (the drilling barge, GRAND BAY) in the course and scope of his employment. At the time, the drilling barge was owned and operated by Brewster-Bartle, Inc. and was engaged, in navigable waters within the State of Louisiana, in drilling an oil well pursuant to a contract with Texaco, Inc. Loomis contracted with Texaco, Inc. to perform certain specialized testing services to test the drill pipe being used in the drilling of the well. The testing was to take place while the pipe was on board the drilling barge. No privity of contract existed between Loomis and Brewster-Bartle.

Loomis sent a two-man testing team, along with the Loomis testing equipment, to accomplish the test. Ray Whisenant was the "operator" of the team and his brother-in-law, W. A. Russ, was his helper. Loomis' testing procedure

called for a relatively small pulley to be hung high in the derrick so that a small cable (a wireline) could be run through it such that one end would be attached to a winch which would be operated by a Loomis employee and the other end would have attached to it a Loomis testing tool which would be lowered into drill pipe while the drill pipe would·be standing upright in the derrick. While Loomis is "rigging up" its testing equipment, the Brewster-Bartle crew does not work in the derrick floor area except for those members of the Brewster-Bartle drilling crew which assist the Loomis crew in rigging up the Loomis testing equipment. It was the established and customary procedure that when specialized services teams, such as the Loomis team, would come aboard a drilling rig, the drilling crew would offer such members of its personnel and/or equipment as was needed by the specialized team to assist in rigging up and/or performing its service. The company (Texaco in this case) that hires the drilling company (Brewster-Bartle in this case) and that hires the specialized service company (Loomis in this case) expects the specialized service company to make use of members of the drilling crew to assist in the rigging up and/or performance of the specialized service and expects, as part of the contractual undertaking, the drilling company to allow its men to be used by the specialized service company as assistants.

Upon arrival at the drilling barge GRAND BAY, Ray Whisenant announced his plan and procedure for the hanging of the Loomis pulley high in the derrick. He told Athos Danos, the Brewster-Bartle driller, that he, Whisenant, was going to tie the pulley with a cable on the top of the traveling block (Block) and that he, Whisenant, was then going to climb the ladder on the outside of the derrick (after being brought up half way by mechanical means) until he got to a position a few feet below the crown of the derrick and that then he would step out on a girder which was the topmost girder (or cross brace) between two of the derrick legs. (This girder was six feet below the crown. Bolted to the underside of the crown across the derrick were two eight inch by ten inch beams referred to as sills.) He then was to, from his position on the top girder, give the driller, who was operating the draw works (a large winch) a hand signal to raise the block upward and when the top of the block got to a point about four or five feet from the bottom of the sills, he would give a hand signal to stop the upward movement of the block. Then Whisenant was going to get out on the top of the block, using the top of the block as a work platform, and unchain the pulley from the top of the block and then reach up and attach the pulley around one of the sills with a cable or chain. The driller offered to send one of the members of the drilling crew up to the crown to assist Whisenant, but Whisenant declined the offer. The derrick is one of the type that is commonly used in the oil industry in south Louisiana. There was nothing abnormal or unusual about it, and the distance from the crown to the rig floor was 142 feet. The block is a heavy metal object through which cables run. The block is pulled up and down in the derrick with the raising and lowering of drill pipe. The block is flat on two sides but on the other sides there is a slope such that the top of a block is a curved surface. There is no flat area on top of the block. Anyone standing on the block would have to position his feet on a curved surface of approximately 30 to 45 degrees. In the top of the derrick at the topmost girder below the crown, the interior of the derrick is approximately six feet square. When the block is positioned so that its widest point (which is about three feet below the top) is even with the topmost girder below the crown, there is only fifteen inches clearance between the side of the derrick and the block on two sides and only twenty-two inches clearance between the side of the derrick and the block on each of the other two sides.

Whisenant chained the pulley to the top of the block, climbed the ladder and positioned himself on the top girder in accordance with his plan and gave a hand signal for the block to be raised. Upon seeing the signal to raise the block, the driller released the brake and the clutch on his machinery, the draw works (winch) was fixed in "idle" speed, thus, the traveling block began going slowly upward at an idle speed similar to the idling speed of an automobile. The driller looked for but did not see any further hand signal. The traveling block struck the sill. Upon investigation, it was found that Whisenant was on top of the block and crushed between it and the sills. Obviously, he had stepped or jumped onto the top of the block unseen by Danos. The block was continuously in motion from the time that the hand signal to raise it was given until it struck the sills.

The derrick sides lean inward, the base of the derrick being much broader across on all sides than the top of the derrick. The inward lean of the derrick sides and the width of the block itself when it was high in the derrick made it very difficult for the driller to have a clear view of the area. The driller could not see Whisenant while Whisenant was positioned on the girder. The driller could only see Whisenant's hand when Whisenant had placed his hand into the interior of the derrick to give the signal for the block to be raised. When Whisenant went back to his normal standing position after having leaned forward to give the signal to raise the block, Whisenant could not be seen by the driller. In the ordinary course of operations, the driller rarely would raise the block nearer than 20 to 30 feet from the crown. Because of the inward lean of the derrick sides, the hanging cables and the movement and size of the block, it was very difficult for the driller to judge distance at the top of the derrick.

The procedure used by Loomis for the hanging of the pulley was unusual and abnormal. Normal and usual procedure for hanging a pulley in the top of a derrick is for the pulley to be brought up on either the "fast" line (one of the "single" cables operated by the driller's draw works) or by the "cat line", (an additional line or cable available in the derrick). If either of these, the fast line or the cat line, had been used there would be no need for the block to go up to the derrick. Therefore, it is highly unusual for the pulley to be brought up into the derrick by use of the block. It is highly unusual and abnormal for anyone to use the top of the block as a work platform. Mr. Huey Hoffpauir, the Loomis supervisor who was in charge of the district from which Whisenant was working, testified that in his thirteen years of having worked for Loomis, he had never worked from on top of the block and that he considered it dangerous to do that. A. W. Russ, Whisenant's helper on the job, told Mr. Venice Borne after the accident that Whisenant had instructed him never to get on top of the block. The normal and usual procedure for hanging the pulley was to have the pulley tied to the fast line or cat line and have the line pulled up to the crown by mechanisms operating the line and to have the Loomis operator (sometimes helped by a member of the drilling crew) while positioned on the ladder near the crown or top girder (or on the crown itself) to then take hold of the separate cable that is attached to the pulley (the cable which is to be used to tie the pulley to the sill) and to then loop it around one of the sills and then clamp or chain it back on the pulley and then untie the pulley from its fastening on the cat line or fast line, thus, accomplishing the hanging of the pulley without any use of the block whatsoever.

Loomis' method of procedure for the accomplishment of the rigging up of the Loomis pulley was unsafe. The procedure was unsafe because:

(a) With the size of rig that was involved, a standard size for use in the area, it was or should have been expected that the traveling block would occupy almost all of the interior of the derrick when it arrived at the location from

which the hand signal was to have been given; this, together with the inward lean of the derrick and the movement of the lines raising the traveling block, would make it extremely difficult for hand signals to be seen;

(b) The safer and the standard methods of raising the block should have been used so that the persons involved in the procedure would not be called upon to attempt new and unusual operations which might involve a man standing on a girder approximately 140 feet above the floor when such maneuvers and operations were unnecessary;

(c) In any and all events, the offered assistance of Mr. Larry Quinn should have been accepted by Whisenant as two persons could much more safely accomplish the hanging of · the pulley than one; the second person could relay signals even if the use of the block method of procedure was to be employed;

(d) Whisenant, who was in charge of the procedure, failed to arrange for any other person on the derrick floor to be informed of the proposed procedures so that signals, etc., could be relayed. Loomis' unsafe method of procedure for the accomplishment of the rigging up of the Loomis' pulley proximately caused the accident.

Additionally, Whisenant's action in getting on to the block while it was in motion and before he had made certain that the block was stopped and locked in place, was contributory negligence on Whisenant's part and a proximate cause of the accident. Whether under the circumstances, it was unreasonable for Danos to have failed to see a hand signal if one was given and a leap or step by a man across a twenty-two inch opening at a distance of approximately 135 to 140 feet, need not be decided because if such was negligence, such negligence would not preclude indemnity. In fact, the unsafe method of procedure devised and executed by Loomis' employee Whisenant, and the decedent's contributory negligence set the sequence for the resultant accident and the shipowner's negligence through Danos, if any, could not possibly have converted Loomis' ill conceived and unsafe method of operation into a safe and sound method of operation. The warranty of workmanlike or seaworthy performance was already well breached by Loomis without regard to the latter fault of Danos, if any.

Employer's National Insurance Company, as the compensation insurer of Loomis under the Compensation Act, paid death benefits and funeral expenses totaling $7,390.00 to Earline Whisenant, individually and as tutrix of her and Ray Whisenant's minor children Sheila Dianne Whisenant, Michael Earl Whisenant and Rebecca Lynn Whisenant. In August, 1965, Mrs. Earline Whisenant instituted this suit for herself and the said minor children for wrongful death against Brewster-Bartle Drilling Company and the Travelers Insurance Company, its insurer, and against Texaco, Inc. Loomis intervened and sought reimbursement if its compensation benefits and funeral expenses paid. On June 13, 1968 Travelers Insurance Company, for Brewster-Bartle, Inc. settled for the cash payment of $22,500.00, all claims of the Whisenant heirs and obtained a dismissal of the main demand which had been filed on behalf of the Whisenants. Employer's National Insurance Company was not included in the above referred to settlement and received no portion of the funds; the settlement was made without the consent of Employer's National Insurance Company. The $22,500.00 settlement was a reasonable settlement for all claims of Mrs. Whisenant and the three minor children. The parties have stipulated that the fixing (and taking of evidence there) of attorney fees, and costs, in the event same are to be fixed, is to be done after rendition of judgment as to the other issues.

■ This Court has jurisdiction to hear this case, this being an admiralty proceeding brought pursuant to Rule 9(h) of the Federal Rules of Civil Procedure. In the case of Ryan Stevedor-

ing Co. v. Pan-Atlantic Steamship Co., 350 U.S. 124, 141, 76 S.Ct. 232, 100 L. Ed. 133, the Supreme Court of the United States allowed the shipowner against whom there could be liability without fault to have an action for indemnity against the employer of persons who temporarily came aboard the vessels to do the work of seamen and who became injured by the unseaworthiness of the vessel in such instances in which those employers were actually at fault in the creation of the unseaworthiness. The *Ryan* case involved a stevedore. Though there is no stevedoring company involved in this case, the theory is the same. A party contracting to perform services beneficial to the vessel owes the vessel owner a duty to perform in a workmanlike manner so as not to render the vessel unseaworthy.

■ The Ryan Doctrine, the doctrine of implied warranty, applies to this case despite the fact that there was no privity contract between Brewster-Bartle, the vessel owner, and Loomis; Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; Waterman Steamship Corporation v. Dugan and McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169. In the *Crumady* case, the Supreme Court stated:

"A warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not."

The cases cited by Loomis, Humble Oil & Refining Company v. Naquin, 414 F. 2d.912 (5 Cir.); Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Company, 410 F.2d 178 (5 Cir.) and Halliburton Company v. Norton Drilling Company, 302 F.2d 431 (5 Cir.), in support of its contention that the Ryan Doctrine should not apply are inapposite and are clearly indistinguishable. Loomis held itself out to be an expert in its testing procedures which necessarily included its rigging up procedures;

Loomis was clearly in charge of outlining the method of procedures by which it was to rig its testing equipment; the unsafe procedure and plan of rigging up rendered the drilling barge unseaworthy and constituted a breach of implied warranty owed by Loomis to the vessel owner under the doctrine announced in Ryan Stevedoring Co. v. Pan-Atlantic Steamship Co., 350 U.S. 124, 141, 76 S.Ct. 232, 100 L.Ed. 133.

■ The Supreme Court has held in no uncertain terms that an unsafe plan of work may constitute unseaworthiness;

"A vessel's unseaworthiness might arise from any number of individualized circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. *The method of loading her cargo*, or the manner of its stowage might be improper." (Emphasis added) Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962).

See also Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967) summarily reversing 358 F.2d 133 (3rd Cir., 1066); Blassingill v. Waterman S.S. Corp., 336 F.2d 367 (9 Cir.); Cleary v. United States Lines Co., 287 F. Supp. 601 (S.D.N.Y. 1967). Furthermore, an additional breach of the implied warranty of workmanlike service was the contributory negligence of Whisenant himself in getting on to the block at the time and under the circumstances that he did. The injured party's contributory negligence may constitute a breach of the implied warranty of workmanlike service such that the injured party's employer will have to reimburse the shipowner under the Ryan Doctrine. Leesich v. Bloomfield Steamship Co., 355 F. 2d 770 (5th Cir., 1966); United States Lines Company v. Williams, 365 F.2d 332 (5th Cir., 1966). Even if a shipowner is guilty of active negligence, such negligence would not preclude indemnity under the Ryan Doctrine if that negligence is merely a concurrent cause

of the accident. Only conduct on the part of the shipowner which actually prevents a stevedore's workmanlike performance is sufficient to preclude indemnity. Southern Stevedoring and Contracting Co. v. Hellenic Lines, Ltd., 388 F.2d 267, (5th Cir., 1968), Albanese v. N. V. Nedere Amerik Stoomvmaats, 392 F.2d 763 (2 Cir.) (concurrent fault is not enough to preclude indemnity); T. Smith and Son, Inc. v. Skibs A/S Hassel, 362 F.2d 745 (5 Cir.); Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; or prior negligence or unseaworthiness on the part of the shipowner which would "prevent or seriously handicap the stevedore in his ability to do a workmanlike job," as the Second Circuit phrases the preclusion test. D/S Ove Skou v. Hebert, 365 F.2d 341 (5th Cir., 1966). Considering the unsafe method of procedure and the contributory negligence of Ray Whisenant, fault by Danos would be at most concurrent fault which would not preclude indemnity.

Travelers and Brewster-Bartle have alternatively pled that in any event, they are not responsible for the actions of the driller, Danos, because he was at the time acting as the borrowed servant of Loomis, citing Williams v. Pennsylvania R. R. Co., 313 F.2d 203 (2 Cir.); Hebert v. California Co., 280 F.Supp. 754 (D. C.); Hanks v. California Co., 280 F.Supp. 730 (D.C.); Touchet v. Travelers Indem. Co., 221 F.Supp. 376 (D.C.). This issue need not be treated in view of the finding that Danos' actions do not preclude indemnity. Employer's National's claim for intervention must be denied, and Travelers and Brewster-Bartle's claim for indemnity under the Ryan Doctrine be granted. Judgment will be entered accordingly, with the parties to have fifteen days to enter a stipulation as to appropriate attorney fees and costs and submit a form of judgment; if a stipulation as to costs and attorney fees cannot be reached, their fixing shall be handled by motion.